```
 1          IN THE CIRCUIT COURT FOR WICOMICO COUNTY, MARYLAND

 2    STATE OF MARYLAND

 3          v.                          CRIMINAL DOCKET

 4    PATRICK J. QUESENBERRY,           NO. 22-K-08-000824

 5               Defendant

 6    _____/

 7

 8             OFFICIAL TRANSCRIPT OF PROCEEDINGS

 9                POST CONVICTION HEARING

10                   VOLUME 1 OF 1

11

12                          SALISBURY, MARYLAND

13                          JANUARY 31, 2013

14

15       BEFORE:

16           THE HONORABLE LEAH J. SEATON, JUDGE

17       APPEARANCES:

18           On behalf of the State:

19               JAMIE L. DYKES, ESQUIRE

20           On behalf of the Defendant:

21               JUDITH B. JONES, ESQUIRE

22

23    Reported stenographically by:

24       Debra A. Dickerson, RPR
         Official Court Reporter
25       410-548-4998
```

1                         T A B L E   O F   C O N T E N T S

2          WITNESSES                        DIRECT CROSS REDIRECT RECROSS

3    On behalf of the Defendant:

4          Patrick Quesenberry              13    79      81      --

5    On behalf of the State:

6          James P. Murray                  82    84      --      --

7

8

9

10                                 EXHIBITS

11                                          Identification   Evidence

12   For the State:

13        None

14   For the Defendant:

15        None

16

17

18

19

20

21

22

23

24

25

```
1                  P R O C E E D I N G S
2           THE COURT:  Okay, so can we go with Quesenberry?
3           And you're Ms. Jones, correct?
4           MS. JONES:  I am.
5           THE COURT:  Very nice to see you again, Ms. Jones.
6           MS. JONES:  Thank you, nice to see you as well.
7           THE COURT:  Okay.  And this is the Defendant,
8    Mr. Quesenberry?
9           THE DEFENDANT:  Yeah, good morning.
10          THE COURT:  Or the Petitioner, I guess, in this
11   proceeding.  Good morning -- it's still morning, right?
12          And Ms. Dykes, you represent the State?
13          MS. DYKES:  I do, Your Honor.  The State calls
14   Patrick Quesenberry, K-08-0824, set for post conviction this
15   morning.
16          THE COURT:  Okay.  I do have, as a housekeeping
17   matter, there are multiple petitions.
18          MS. JONES:  Correct.
19          THE COURT:  I need clarification as to what's at
20   issue.
21          MS. JONES:  I have already anticipated that
22   request.
23          THE COURT:  All right, good.
24          MS. JONES:  And I thought I would do that.  First,
25   I'm Judith Jones on behalf Mr. Quesenberry who is here to my
```

```
1    right.
2              THE COURT:  And you may take a seat for the
3    moment, Mr. Quesenberry.
4              THE DEFENDANT:  All right.
5              MS. JONES:  And we would ask you to take the
6    transcript into evidence, and the appellate opinion, which I
7    think should all be there.
8              THE COURT:  So ordered.
9              MS. JONES:  There should be a motions hearing on
10   January 30, 2009.
11             THE COURT:  Okay.
12             MS. JONES:  A trial on February 24, 2009.
13             THE COURT:  All right.
14             MS. JONES:  And then there's a sentencing on
15   April 8, 2009.
16             THE COURT:  Okay.
17             MS. JONES:  We'd ask you to take judicial notice
18   of the court file.  And since Mr. Murray is here I would ask
19   to sequester witnesses because he was defense counsel.
20             THE COURT:  All right, Mr. Murray.
21             MR. MURRAY:  Yes, Your Honor.
22             THE COURT:  I know you know what sequestration
23   means, but for the record you're being sequestered.  That
24   means you wait outside, you're not here during the testimony.
25   Don't discuss your testimony in the case with anyone until
```

```
 1    you're notified that the hearing has concluded.  You'll come

 2    in, give your testimony under oath and then exit the

 3    courtroom.  So you may wait outside.  Thank you very much.

 4              MS. JONES:  Thank you, Your Honor.

 5              THE COURT:  So we have three transcripts:

 6    1-30-09, 2-24-09, and 4-8-09, right?

 7              MS. JONES:  Correct.

 8              THE COURT:  Okay.

 9              THE CLERK:  Your Honor, did you want them marked?

10              THE COURT:  You want them marked, the transcripts,

11    as exhibits?

12              MS. JONES:  If they are part of the court file I'd

13    ask you to take notice of the court file.

14              THE COURT:  I believe they are already in here.

15              MS. JONES:  However you prefer to do it.

16              THE COURT:  I've got January 30th.  Let me make

17    sure I've got them.  January 30th, February 6th,

18    February 24th.  Is this the sentencing here?  I'm having a

19    hard time finding the date on this one.

20              MS. JONES:  The sentencing was, what did I say,

21    April 8th?

22              THE COURT:  I'm just looking for the date on it.

23              MS. JONES:  April 8th.

24              THE COURT:  I'm having a hard time seeing it on

25    here.  Oh, there it is, April 8th.  Okay, yes, I have them
```

1    all.  I'll take judicial notice.  All right, very good, thank

2    you very much.

3         MS. JONES:  Okay.  Now maybe the easiest way to do

4    this is we have six pro se petitions and one supplemental

5    petition through counsel.

6         THE COURT:  Yes.

7         MS. JONES:  So I would run through these and

8    explain to the best of my understanding what the issues that

9    Mr. Quesenberry has raised.  Then when I ask him to testify I

10   will run through these and he can make a comment about them,

11   would that be acceptable?

12        THE COURT:  Yes, all that's acceptable, except

13   here's what I guess I want to understand.  Is your amended

14   supplemental petition intended to incorporate all the issues

15   in all the pro se petitions?

16        MS. JONES:  Yes, it would.

17        THE COURT:  So are you going to go through the

18   ones in your amended petition?

19        MS. JONES:  I will go through those and I will

20   give arguments on those.

21        THE COURT:  Okay.  So he then is going to agree

22   that your supplemental petition, amended/supplemental petition

23   represents the petition, because he only gets one hearing.

24        MS. JONES:  Correct.

25        THE COURT:  And I want to make sure I rule on



1   every single solitary issue.  Don't raise your hand, I'll get

2   to you in a minute.

3            THE DEFENDANT:  Okay.

4            MS. JONES:  Mr. Quesenberry has raised numerous

5   issues, some of which I chose not to expound upon.

6            THE COURT:  Okay.

7            MS. JONES:  But he would like to be able to

8   address the Court as to why those issues have merit.

9   Therefore, I do not want to waive any of those issues, and if

10  it works to incorporate them.

11           THE COURT:  Then let me just explain to you, for

12  my purposes when I go to do my opinion.  I list exactly what

13  the issue is and then I write my opinion on it.

14           MS. JONES:  I understand.

15           THE COURT:  I don't want to have a situation where

16  I have to go through every single listed issue he's got and

17  say that's still out there, so I need some clarification of

18  which of his issues are still out there.  Now if you need a

19  little time to do that I'll be happy to --

20           MS. JONES:  I'm going to try my best and if we get

21  bogged down --

22           THE COURT:  Because I had my Law Clerk go through

23  each one and list them as best he could, just so I'm clear.

24  Mr. Quesenberry, if this is confusing you, you only get one

25  opportunity at this.

1          THE DEFENDANT:  Right.

2          THE COURT:  I want to afford you your full

3    opportunity in all that the law allows you and due process

4    requires.

5          THE DEFENDANT:  Yeah.

6          THE COURT:  Do you understand that?

7          THE DEFENDANT:  Right.

8          THE COURT:  Don't tell me anything yet, because

9    you're going to have an attorney and she's going to ask you

10   questions, but I need to make sure what it is you're calling

11   upon me to decide.

12         THE DEFENDANT:  Right.

13         THE COURT:  So you're going to need to work with

14   your attorney about that and I'm going to need to be clear

15   exactly which ones of these issues in these pro se you want a

16   separate ruling on.

17         So, counsel, that's what I'm going to need for you

18   to do.  I realize you have a challenging role here.

19         MS. JONES:  I will try my best, and thank you for

20   the ability to have a little bit of give and take on this and

21   then we'll try to get to a good list that will be on the

22   record with everything that we're --

23         THE DEFENDANT:  Could you ask about the 911 call?

24   Because there's errors that are not being litigated.

25         THE COURT:  Well, let's do this.  You go ahead and

1   present his testimony and when you're done let's see what's

2   left of his list.  Can we try it that way?

3          MS. JONES:  Let's try it, because what I did is

4   probably much like what your law clerk did, try to bullet out

5   each issue.

6          THE COURT:  Okay.

7          MS. JONES:  There was a pro se petition, the first

8   one that was filed was on January 25, 2012.  And that, the

9   first issue with ineffective assistance of Assistant Public

10   Defender Jim Podlas to obtain witnesses and to investigate the

11   State's witnesses, obtaining Defendant's DNA without a warrant

12   and an impermissible show up.  And that Mr. Podlas in certain

13   ways did not do what he should have done.

14          THE COURT:  I can't even find this in my packet,

15   hold on a minute.  The first one I have has a date at the top

16   in a letter that is says January 17th.

17          MS. JONES:  Okay.  It was filed on -- there might

18   be a cover letter on it.  This is a quite lengthy --

19          THE COURT:  Well, number one on this one --

20          MS. JONES:  On the last page it does say, yes, I

21   hereby certify on January 17, 2012, and it was filed with the

22   clerk on January 25th.

23          THE COURT:  My allegation number one in that one

24   is the assistance, that's a typo, I'm assuming, Public

25   Defender violated Petitioner's compulsory process, I don't see

1   Mr. Podlas's name mentioned there.  So I don't know that I'm

2   looking -- I'm not looking at the same thing as you.

3           MS. JONES:  That's correct, that's exactly what

4   you have.

5           MS. DYKES:  For purposes of clarity, Your Honor, I

6   might.  Mr. Podlas was initially assigned the case and then

7   Petitioner filed a grievance against Mr. Podlas and Mr. Murray

8   got in the case.

9           THE COURT:  Okay.

10          MS. JONES:  Yes, that's correct.

11          THE COURT:  So I'm looking at the one he's looking

12  at.  Go ahead, Ms. Jones, thank you so much.

13          MS. JONES:  Thank you.

14          Now what Mr. Quesenberry is saying that Mr. Podlas

15  took down the names of witnesses that Mr. Quesenberry wanted

16  subpoenaed and those were two people at the intake at Wicomico

17  County Detention Center.  One was an inmate named Robert

18  Fretz.

19          THE COURT:  Now, where is that in this list?

20          MS. JONES:  Well, it really -- on page three of

21  nine.

22          THE COURT:  On page three of what?

23          MS. JONES:  At the top it says page three of nine

24  and there's an A under it.

25          THE COURT:  Okay.

1    MS. JONES:  And down there there's number one and

2    two.

3         THE COURT:  Oh, I see, okay.  These are the facts.

4         MS. JONES:  Right.  But these are really what are

5    raising the issues of what is alleged that Mr. Podlas did not

6    do.

7         THE COURT:  Okay.  I guess, you know, I'm not

8    really trying to be difficult, I just want to know what I'm

9    called on to rule on.  And I'm not going to be able to parse

10   through all this and figure out that what he's listed as a

11   fact is, in fact, an allegation.  I mean, I'm curious if you

12   think everything gets covered in your petition, in your

13   petition you did.

14        MS. JONES:  Well, I'm trying to incorporate his

15   pro se petition.

16        THE COURT:  Right, that's what I mean, you think

17   you've done that.

18        MS. JONES:  I have not, as I say I have not

19   expounded upon them.  And I realize this is difficult for the

20   Court.

21        THE COURT:  Well, because this is alleged as a

22   fact.

23        MS. JONES:  Okay.

24        THE COURT:  And it's to prove which allegation?

25        MS. JONES:  What I tried to do with these -- okay.

```
 1    These are the -- as examples of how Mr. Podlas violated

 2    Petitioner's compulsory process of obtaining witnesses, these

 3    are examples of how Mr. Podlas did that.

 4              THE COURT:  And that's alleged by him where?

 5              THE DEFENDANT:  Can I talk to you for a second?

 6              MS. JONES:  Yes.

 7              THE COURT:  Go ahead, take your time and talk to

 8    him.

 9              THE DEFENDANT:  Because I can help out a lot here.

10              THE COURT:  Wait a minute.  Push down on that so I

11    don't hear it.

12              THE DEFENDANT:  The first petition --

13              THE COURT:  Wait a minute, talk to your lawyer

14    first.

15              THE DEFENDANT:  Okay.

16              THE COURT:  Do you want to talk to him, Ms. Jones?

17    Would it help you if you had a chance to talk to him about

18    this?

19              THE DEFENDANT:  Just drop everything in the pro

20    se, that first pro se.

21              MS. JONES:  Mr. Quesenberry is saying he wants to

22    drop --

23              THE DEFENDANT:  That first one.

24              MS. JONES:  You mean just the first allegation?

25              THE DEFENDANT:  No, the first, everything in here.
```

1          MS. JONES:  The entire thing you want to drop?

2          THE DEFENDANT:  Yes, that pro se filed on the

3   21st, everything, drop it.

4          THE COURT:  Okay.

5          MS. JONES:  You are sure?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Let's put him under oath and then you

8   can ask him some questions about that.

9   _____

10  Whereupon,

11                  PATRICK J. QUESENBERRY,

12  a witness produced on call of the Petitioner, after having

13  been duly sworn, according to law, was examined and testified

14  as follows:

15                  DIRECT EXAMINATION

16          THE COURT:  Mr. Quesenberry, listen to me

17  carefully.  You only get one post conviction hearing.  I'm

18  more than willing to give you more time to talk with Ms.

19  Jones.  She's going to ask you some questions.

20          All right, go ahead, Ms. Jones.

21  BY MS. JONES:

22      Q.    Mr. Quesenberry, this petition that you filled,

23  you mailed on January 17, 2012.

24      A.    Uh-huh.

25      Q.    Are you saying now that you would like to abandon

1    all the issues raised in here?

2          A.    In the first one that was filed on 1-25-12, yes,

3    only.

4          Q.    Only, okay.  And those have issues concerning Mr.

5    Podlas, you're dropping that; is that correct?

6          A.    Yeah.  The false testimony, and there's an opinion

7    order that was false.  There was like six allegations.  I

8    didn't understand the statement of facts in the pro se.

9          Q.    Now do you want to waive or drop the

10   allegations --

11         A.    I would like to waive it --

12         Q.    -- that Mr. Peabody was ineffective?

13         A.    Peabody?  Yes.

14         Q.    From appellate.

15         A.    Yes.

16         Q.    You sure?

17         A.    Yes.

18         Q.    What about the substitution of Mr. Murray for Mr.

19   Podlas, is that something you want to keep?

20         A.    No.

21         Q.    You want to get rid of that?

22         A.    Mr. Podlas in that one I want to drop.  I want to

23   clarify, some of this stuff I don't want to continue.

24         Q.    Okay.  And you also said that Judge Jackson's

25   order denying the motion to suppress the DNA was erroneous; do

1    you want to drop that?  That was your issue number five.

2              THE DEFENDANT:  Yeah.

3              MS. JONES:  You want to drop that, okay.

4              And that your arrest was illegal.

5              THE DEFENDANT:  I want to keep that.  I got it

6    incorporated into another one.

7              THE COURT:  Is that already in --

8              THE DEFENDANT:  Into another pro se.

9              THE COURT:  Okay.  So you're willing to

10   withdraw --

11             THE DEFENDANT:  Yeah, that one.

12             THE COURT:  -- let me finish.  All the allegations

13   in the petition except those that are incorporated into some

14   that you are not withdrawing.

15             THE DEFENDANT:  Yeah.  I made amended allegations

16   better than this, in this one right here is --

17             THE COURT:  Let's wait for Ms. Jones because it's

18   important that she hear what you say.

19             MS. JONES:  I'm sorry, I just wanted to make sure

20   I have my notes.

21             THE COURT:  So he's withdrawing the petition

22   filed, the first pro se petition filed on January 25, 2012,

23   because he believes the issues he still wants to raise remain

24   in the other outstanding pro se petition, is that fair?

25             THE DEFENDANT:  Yes, because this is more

1   confusing.  Just like you said, it's a statement of facts, I

2   was confused, I've never done a pro se before.

3           THE COURT:  I don't mean that as a criticism.

4           THE DEFENDANT:  Oh, no, I want you to criticize

5   me.

6           THE COURT:  It's just that what I'm called upon to

7   do is consider every allegation you make and look at the law,

8   weigh it carefully, and make a proper ruling under the law.

9   In order for me to do that I have to know what the allegation

10  is.

11          THE DEFENDANT:  Yeah.

12          THE COURT:  So he's withdrawing -- make sure you

13  take a note of that, Mr. Fitzgerald -- the petition that was

14  received January 25th in this court.  Okay.

15          Now go ahead, maybe we can get somewhere on the

16  second one.

17          THE DEFENDANT:  Can I -- I'm still under oath,

18  right?  So I'm hoping that the statement of facts to be

19  incorporated into all my other issues, because she's got the

20  statement of facts in there, so I try to keep it the same all

21  the way.

22          THE COURT:  What statement of facts?

23          THE DEFENDANT:  Her statement of facts of what

24  happened during the proceedings.

25          THE COURT:  In the petition by Ms. Jones?

1              THE DEFENDANT:  Yeah.

2              THE COURT:  Well, that one is in front of me so

3    don't worry about that.

4              THE DEFENDANT:  Okay.  So I'm trying to keep the

5    statement of facts all the same throughout and put allegations

6    in other ones.  See, I was indigent and I had to file as I got

7    the money.  I didn't want to waive no allegation of error.

8              THE COURT:  That's all right, you're allowed to do

9    that.

10   BY MS. JONES:

11        Q.    Let me ask you one question, the statement of

12   facts that I wrote in the supplemental petition, is that

13   agreeable to you?

14        A.    Yeah.

15             THE COURT:  Very good, thank you very much.

16             Now what about this amended petition that was

17   filed it looks like April 30th?

18   BY MS. JONES:

19        Q.    April 30th.  This had to do with the DNA testing

20   was not verified by the director under the Public Safety Law

21   2-508.  That's what you raise in that petition.  You want to

22   keep that?

23        A.    Yes, I want to keep that.

24        Q.    When we get to that point we'll say why you think

25   that's important.

1          THE COURT:  Okay.  So that's not in your amended
2    petition.
3          MS. JONES:  No, it is not.
4          THE COURT:  So in amended supplemental pro se
5    filed on April 30th he's keeping where it's allegation of
6    error, is that what, number four?
7          MS. JONES:  And that is --
8          THE COURT:  Is that what the issue is?  No, he's
9    got it on page five, allegations of error.
10          MS. JONES:  That the DNA match contained in the
11    MSP crime lab exam used at the trial violates due process by
12    circumvention of the Maryland DNA Collection Act, Public
13    Safety Law, and specifically Public Safety Law 2-508 because
14    the director did not verify the DNA report.  Is that correct?
15          THE DEFENDANT:  That's correct.
16          THE COURT:  And where is that written now?  Oh,
17    page six of eight?
18          MS. JONES:  Correct.
19          THE COURT:  So what you want me to consider is
20    this also violates Petitioner's rights in Maryland Code,
21    Public Safety Article 2-508, availability of DNA profile in
22    pertinent part in general --
23          THE DEFENDANT:  Yes.
24          THE COURT:  -- on written or electronic request
25    after quote verification by the director.  So that's it,

1    Mr. Fitzgerald, that's his allegation.  I'm just telling my

2    law clerk because he's going to help me write it.  Page six of

3    eight and it begins with this also.

4    BY MS. JONES:

5         Q.    This is the main issue from this particular

6    document, right?

7         A.    Yes.

8              THE COURT:  Because here's what's going to happen,

9    I'm going to take what your issue is, I'm going to write

10   exactly what you say it is, and then I'm going to rule on it.

11   So that's what I'm going to write.

12              Is there any other one from this one, Ms. Jones?

13              MS. JONES:  Not that I can tell, no.

14              THE COURT:  Okay.

15              MS. JONES:  This has the -- the actual DNA report

16   is attached.

17              THE COURT:  Okay.  So April 30, 2009, page six of

18   nine.  Very good.

19              MS. JONES:  And in this regard I would refer you

20   both to the report that's attached and to the testimony in the

21   transcript.

22              THE COURT:  The report that's attached to what?

23              MS. JONES:  The report was attached as an exhibit.

24              THE COURT:  To his petition?

25              MS. JONES:  To his petition, correct.

```
 1              THE COURT:  And the report.

 2              All right, go ahead.

 3   BY MS. JONES:

 4       Q.    Now the next petition was number three, it looks

 5   like that was docketed on September 29, 2012, right?

 6       A.    Uh-huh.

 7       Q.    And that one, as I understand it, the allegations

 8   are that the Fourth Amendment was violated by the DNA search

 9   and seizure and a statement that Mr. Quesenberry made.

10              Okay.  Let's go to page two.  Petitioner was

11   denied due process of law when Assistant State's Attorney used

12   evidence obtained without probable cause of a reasonable

13   search and seizure against Petitioner at his trial.

14              And then B, Petitioner was denied due process of

15   law when Assistant State's Attorney obtained a second DNA

16   sample from him pursuant to the Public Safety DNA Collection

17   Law.

18              THE COURT:  Okay.  So those are the two issues he

19   wants me -- there's a C, it goes on.

20   BY MS. JONES:

21       Q.    And the third, what exactly -- are you talking

22   about your statement?

23       A.    Huh-uh.

24       Q.    What are you talking about?

25       A.    I'm attacking the suppression court's fact finding
```

1   opinion and order that it states probable cause on officers

2   were repressed after he denied that motion on February --

3       Q.    So you're saying that Judge Jackson's ruling was

4   in error.

5       A.    He ruled determination of probable cause after he

6   denied a February 6th motion regarding Miranda rights.

7       Q.    Okay.

8       A.    He never mentioned anything about.  But I contend

9   it violates Maryland Code Section 2-202(c) of the Criminal

10  Procedure Article, and I didn't get a right to challenge or

11  rebut.

12          THE COURT:  Okay.  So he wants to leave all those

13  A, B and C allegations of error.

14          THE DEFENDANT:  Yes.

15          MS. JONES:  Correct.

16          THE COURT:  Okay.  So from the one filed

17  August 29th, 2009 he's seeking a ruling under A, B and C.

18          Okay.  Go ahead.  Very good, thank you.

19          MS. JONES:  All right.  Now the pro se number

20  four, this was received by the State's Attorney, and the

21  State's Attorney sent it to me, and it's date stamped

22  September 10, 2012.

23  BY MS. JONES:

24      Q.    And this, as best as I understand it, you were

25  concerned about the notice of substitution when Mr. Murray

```
1    took over the case?

2         A.    Right.

3         Q.    And that no notice of substitution was actually

4    filed.

5         A.    Right.

6         Q.    So do you want to keep that as an allegation?

7         A.    Yes.

8              THE COURT:  Okay, where is that on here?

9    Allegation of error includes Petitioner is denied due process

10   of law to obtain effective assistance of counsel pursuant to

11   Sixth Amendment, is that what my heading is going to be?

12             THE DEFENDANT:  Yes.  And I got three --

13             THE COURT:  You'll be asked about it, you can tell

14   me what you mean about it, but I want to make sure I know what

15   the issue is.

16             MS. JONES:  So this was where Mr. Murray took over

17   the case but did not formally file notice of substitute

18   counsel.

19             THE COURT:  Okay, go ahead.

20             MS. JONES:  We were onto -- this had to do with

21   the failure to file a notice of substitution.

22             THE COURT:  Which one are you on now?

23             MS. JONES:  I am on the one that says on the front

24   it was received September 10th.

25             THE COURT:  Okay, we're still on that.
```

1          MS. JONES:  So I would say that that was number

2     four.

3          THE COURT:  I have that as the fourth one, too.

4     BY MS. JONES:

5          Q.    Okay.  And you're saying also in here, the second

6     allegation, which is on page 9 of 12, was that it was

7     ineffective assistance for deficient performance as a right of

8     ineffective assistance of counsel?

9          A.    Yeah.

10         Q.    By not pursuing a DNA match that could have been

11    available.

12         A.    Yeah.  Under 258(b) section, lower case b,

13    availability to Defendant.

14         Q.    Okay.

15         A.    Section 2(i).

16         Q.    So you're saying that the --

17         A.    A reasonable competent attorney would have sought

18    that to rebut the allegation of DNA in the suppression

19    hearing.

20         MS. JONES:  Okay.

21         THE COURT:  Anything else in that one?

22         MS. JONES:  And also there's one more that Mr.

23    Podlas conceded -- this is on the third, it's on page ten,

24    that Mr. Podlas, I'm sorry, Mr. Murray improperly argued in

25    his judgment of acquittal conceding that there was evidence of

1   a breaking.  And that he shouldn't have conceded that.

2             THE DEFENDANT:  Yes.  In a nonjury proceeding.

3             THE COURT:  Okay.  But what confuses me is he's

4   got this listed under his -- okay, wait a minute.  Well, he's

5   basically -- that all comes under ineffective assistance of

6   counsel generally I guess.

7             MS. JONES:  Yes.

8             THE COURT:  But those are the three allegations,

9   his closing argument.

10            MS. JONES:  So we have that.

11            THE COURT:  You got all that, Mr. Fitzgerald?

12  We're going to need to make these heading.

13            THE DEFENDANT:  There's two more.

14            MS. JONES:  Then there was one that is dated,

15  there's a cover letter dated November 6th, it's date stamped

16  filed November 13th.  I would say that this is number five.

17            THE COURT:  Okay.  I don't seem to have that one

18  in my notebook, here.

19            MR. FITZGERALD:  It may be at the back of the

20  file, Your Honor.

21            THE COURT:  Be careful, that's heavy.

22            Go make me a copy.

23            Tell me what that one does.

24            MS. JONES:  This one alleges that under Section

25  8-201(b) that Mr. Quesenberry has a right to challenge DNA

1   evidence, it's the Newly Discovered Evidence Statute under the

2   Post Conviction Statute.

3           THE COURT:  And how is that ineffective -- well,

4   it's for post conviction relief but it's not ineffective

5   assistance of counsel.

6           THE DEFENDANT:  No.

7           THE COURT:  I don't have it in front of me,

8   counsel, so I don't know.  And because it wasn't in my

9   notebook I didn't -- what I do is I have all the petitions,

10  just for the record, put into a notebook so that I can review

11  them.  And then I also read the transcripts in advance of

12  these hearings.

13          MS. JONES:  Okay, here, allegations of error, this

14  is on page 2 of 12.

15          THE COURT:  Okay.

16          MS. JONES:  Petitioner is denied due process of

17  law under the Fifth and Fourteenth Amendment and the Maryland

18  Constitution Article 24 to claim a wrongful conviction on the

19  DNA evidence used by the State pursuant to Section 8-201, DNA

20  evidence post conviction review.  And that findings requiring

21  DNA testing to use as match of evidence under that Statute.

22          THE COURT:  So what's he asking me to do?

23          THE DEFENDANT:  Can I say?

24          MS. JONES:  Sure.

25          THE DEFENDANT:  Under that I'm contending that DNA

1  test results deny me due process to file a DNA post conviction

2  review pursuant to new trial and findings requiring DNA

3  testing.

4          THE COURT:  Okay.  I'll just have to hear from you

5  when the evidence gets put on.

6          THE DEFENDANT:  Yeah, I got the case law and

7  everything.

8          MS. JONES:  Okay.

9          THE COURT:  So I've got one issue on the

10  November 13, 2012, petition.

11          MS. JONES:  Correct.  It had to do with DNA

12  testing and not having access to that Statute.

13          THE COURT:  Unfortunately, because my law clerk is

14  copying it, as I said, I have a system, and my system is that

15  I have all the petitions put in a notebook and I read them in

16  advance and then I try to have the issues distilled, and then

17  I read the transcript.  And unfortunately I guess it was just

18  inadvertently overlooked, so I didn't have a chance to see

19  that one.  So can I look at yours for a moment?

20          MS. JONES:  Yes, of course.

21          THE COURT:  So that I can understand, I really

22  truly like to understand in advance as much as I can.

23          Okay, so this is the allegation, Petitioner is

24  denied due process under the United States Constitution, this

25  -- is it written specifically here?

1          MS. JONES:  Uh-huh.

2          THE COURT:  Okay.  So that will be my heading for

3    that allegation.

4          Okay, very good, thank you very much.  And I'll

5    have that in my notebook by the time you get to it because

6    he's making me a copy.

7          All right.

8          MS. JONES:  And then, Your Honor, there is the

9    last petition, and that was filed --

10         THE COURT:  Oh, there's another one that I didn't

11   see?

12         MS. JONES:  There's a number six, that was

13   received by the Court on 2-27-12.  Did you get that?

14         THE COURT:  What was the date of the last one,

15   11-13 what?

16         MS. JONES:  That was received docketed on

17   November 13, 2012.

18         THE COURT:  So 2-27-12 was in advance of that.

19         MS. JONES:  12-27-12.

20         THE COURT:  Oh, 12, I thought you said 2.

21         MS. JONES:  I'm sorry, did I misspeak?  I'm sorry.

22         THE COURT:  Or I could have misheard.

23         MS. JONES:  December 27, 2012, another one came

24   in.

25         THE COURT:  Okay.

1          MS. JONES:  And that -- well, it appears to

2     reiterate the issue of the improper substitution and failure

3     to file the notice of substitution.

4          THE COURT:  Is there anything new in it?

5     BY MS. JONES:

6          Q.   But you raised it as a due process violation.

7          A.   No.  Petitioner is denied due process of law --

8          Q.   Petitioner is denied, this is on page two, denied

9     due process of law under the Sixth and Fourteenth Amendment of

10    the confrontation clause, Rule 4-252, on the suppression

11    hearing of the Judge's probable cause determination.  So

12    you're challenging the Judge's probable cause determination

13    from the motions hearing.

14         A.   Uh-huh.  I have a ruling here for 2254.

15         Q.   All right.  Then you're also saying that you were

16    denied due process of law to have compulsory process for

17    obtaining witnesses in your favor of the substitution hearing.

18         A.   Yes.

19         Q.   Does this have to do with Robert Fretz and Ms.

20    Humphries?

21         A.   I'm attacking the opinion and order for 2254(d)1,

22    in case I don't get relief here in this court I have to raise

23    it in this post conviction to get ruling all the up to the

24    Court of Special Appeals so I can present it to the habeas

25    corpus because I can continue on Sixth Amendment grounds.

1          MS. JONES:  Okay, all right.

2          THE COURT:  So how many issues are there on that

3    one?

4          MS. JONES:  There appear to be four.

5          THE COURT:  Are they listed so I'll have a

6    heading, so I know what I'm ruling on?

7          MS. JONES:  These are on the page two of 12.

8          THE COURT:  Okay.

9          MS. JONES:  Petitioner is denied due process of

10   law under the U.S. Constitution Fourteenth Amendment pursuant

11   on Maryland Rule 4-401(b) following DNA testing of the

12   criminal causes because the State's composed DNA results.

13   BY MS. JONES:

14       Q.    And then the fourth issue that you raise is the

15   request for discovery of the 911 phone call.

16       A.    And I haven't got that yet.

17       Q.    You've never gotten that 911 phone call.  So

18   you're saying that there was a discovery violation, is that

19   what you're trying to say?

20       A.    When a prosecutor maintains an open policy it

21   doesn't say I need to file a motion, all I have to do is send

22   a letter.  And I was hoping that you could obtain that for me

23   because it's Maryland Public Information Act is part of that.

24       Q.    Okay.

25       A.    And I never got that so I can cast doubt on the

```
1    probable cause determination of the Salisbury Scott Willey.

2    He said he got a -- dispatch advised a white male wearing blue

3    shorts and no shirt, and I want to know, because Christine

4    Sifford testified that she made the 911 call but she never saw

5    nobody.

6          Q.     This is the mom of the girl.

7                 THE COURT:  Okay.

8                 THE DEFENDANT:  The mom, Christine is the mother.

9    BY MS. JONES:

10         Q.     Christine is the mother and made a 911 call.

11         A.     Yes.

12         Q.     And you're contesting that --

13         A.     That allegation is like a ghost right now, and

14   without that I would be waiving -- I'm not going to waive it.

15   So I was hoping to ask the Judge if I could have the 911 call

16   from the Maryland Public Information Act and then come back.

17         Q.     Well, you can't, actually.

18                How would the 911 call change the outcome?

19         A.     The outcome would show that he wouldn't have -- he

20   said dispatch, he's not saying radio dispatch as specific

21   under the Maryland 4-263(d)7 specific search and seizures.

22   He's got a phantom dispatch advising a white male suspect

23   wearing blue shorts and no shirt and he detained me.  So those

24   are the first two sentences of his first paragraph in the

25   statement of probable cause.
```

1      Q.     In the statement of probable cause, that he had a

2   911 call and he responded to it?

3      A.     And I can cast doubt that he has conniving --

4           THE COURT:  Well, I'm going to hear testimony in a

5   minute, I'm just really trying to figure out what the issues

6   are.

7           THE DEFENDANT:  Okay.

8           MS. JONES:  Well, okay.  So --

9           THE COURT:  Okay, I'm going to have that one here

10  in a minute so tell me what page you're on.

11          MS. JONES:  Okay.  Well, these are on page -- this

12  is the last petition and pro se petition, and these are on

13  page 2 of 12, and there are basically four allegations of

14  error.

15          THE COURT:  Okay.  Let me see if I can -- just

16  hold on a minute, I'm putting these in here.  Thank you very

17  much.

18          Okay.  So these four that are listed here, okay.

19  Those will be my headings.  So I'm going to, as soon as

20  Mr. Fitzgerald gets back to his seat, what I'm going to do is

21  read what I understand to be the issues I'm to rule on on the

22  pro se petitions, understanding, of course, that in your

23  petition I think I know what I'm supposed to rule on because

24  you have listed each allegation with a heading.  Correct?

25          MS. JONES:  Yes.

1          Now I also believe, Mr. Quesenberry, is it correct

2   just to help Judge Seaton, that you do not want to file an

3   application -- to ask the ability to file for a three judge

4   panel review.

5          THE DEFENDANT:  I don't want that.

6          MS. JONES:  You would you like to withdraw that.

7          THE DEFENDANT:  Yes.

8          MS. JONES:  And that's in the supplemental

9   petition.

10          THE COURT:  That you filled?

11          MS. JONES:  That I filed, yes.

12          THE COURT:  So he's withdrawing in the

13   supplemental petition.

14          MS. JONES:  The request for three judge panel.

15          You would like to keep the other two issues.

16          THE DEFENDANT:  Yes.

17          THE COURT:  Okay.

18          MS. JONES:  And those two issues are an illegal

19   sentence on the burglary merger issue and the right to file a

20   motion to reconsider the sentence.  And that just wraps it up,

21   I think.

22          THE COURT:  Okay.  Now in the pro se petitions

23   he's withdrawn the original or the first one filed January 25,

24   2013.  And I'll note for the record, since I'm having this

25   transcript, it will be at about 11:38 that I'm making this

1    finding.

2              And you said you're withdrawing the three judge

3    panel, is that correct?

4              THE DEFENDANT:  Yes.

5              THE COURT:  You understand -- and you're

6    withdrawing your first pro se petition?

7              THE DEFENDANT:  Right.

8              THE COURT:  You understand this is your only post

9    conviction hearing.

10             THE DEFENDANT:  Right.

11             THE COURT:  This is the only chance you have and

12   you still wish to withdraw those two issues?

13             THE DEFENDANT:  Yes.

14             THE COURT:  The whole petition in one case.

15             THE DEFENDANT:  Yes, knowingly and voluntarily.

16             THE COURT:  And the request for the three judge

17   panel.

18             THE DEFENDANT:  Yes.

19             THE COURT:  Okay.  So in the pro se petition filed

20   April 30, 2009.

21             MS. DYKES:  2012, Your Honor.

22             THE COURT:  I'm sorry, was that filed 2012?

23             MS. JONES:  Yes.

24             THE COURT:  April 30, 2012.  Page two, the

25   allegation of error is Petitioner was denied due process of

1   law when the prosecutor used DNA evidence that may only be

2   used as probable cause, that's what you're raising, or do I

3   have that wrong?

4           MS. JONES:  It would be on page six.

5           THE COURT:  Oh, I'm sorry, okay.  Maybe I'm in the

6   wrong one.  Please forgive me, sir, I'm doing the best I can

7   here.

8           On page six begins with what?

9           MS. JONES:  This violates Petitioner's right in

10  Maryland Code Public Safety Article 2-508, availability of DNA

11  profile -- I'm sorry, strike that for a second.

12          THE COURT:  Oh, I see.  The way this is numbered

13  -- I'm sorry.  Yes, I see it, I have issue written there.

14  This violates Petitioner's rights under Maryland Code Public

15  Safety Article Section 2-508, availability of DNA profile in

16  pertinent part, sub a, in general, one, on written or

17  electronic request after quote verification by director end

18  quote underlined that a match has been made in the population

19  data base, et cetera.  Then you go from one to little iii and

20  little iv, right, that's what you want me to rule in that?

21          MS. JONES:  And what about above that?

22          THE DEFENDANT:  Yeah, I incorporated 2-510 in the

23  other one, but yeah, I want to say it violates Maryland Code

24  Public Safety Article Section 2-510.

25          THE COURT:  You know what, you only get one

1    hearing.  I've got to know what the issues are.  It can't be

2    my job to go back and guess.  I've got to know.

3              THE DEFENDANT:  Right.

4              THE COURT:  So do you want to have some time to

5    talk with Ms. Jones?  What I'd really like is a list, because

6    I thought I was going to be able to do this list and now I'm

7    not sure I can.

8              THE DEFENDANT:  Just say 2-508 in this one because

9    I got it incorporated into another allegation of error anyway.

10             THE COURT:  Well, this also violates Petitioner's

11   rights in Maryland Code Public Safety Article 2-508, did you

12   want to add and 2-510?

13             THE DEFENDANT:  Yeah, that's what I was trying to

14   say combined.

15             THE COURT:  Here's what I'm not going to do.  I'm

16   not going back to my office --

17             THE DEFENDANT:  Right.

18             THE COURT:  Listen to me carefully.  Write an

19   opinion where I'm guessing what the issue is.

20             THE DEFENDANT:  Yeah.

21             THE COURT:  Do you want me to just add 2-508 and

22   2-510?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Just the words 2-510?

25             THE DEFENDANT:  Yes.

1          THE COURT:  And then you can advance whatever

2    argument you want to under it.

3          THE DEFENDANT:  Yes.

4          THE COURT:  Would that cover it, Ms. Jones?

5          THE DEFENDANT:  Yes.

6          MS. JONES:  Yes, I believe it would.

7          You're concerned that the process wasn't correct,

8    am I --

9          THE DEFENDANT:  Can't use the DNA testing as a

10   result because of those.

11         MS. JONES:  Because it wasn't verified.

12         THE DEFENDANT:  Yes.

13         MS. JONES:  Therefore you have to throw out the

14   DNA testing.

15         THE DEFENDANT:  I'm denied due process of law.

16         THE COURT:  Okay.  Tell me what's at issue under

17   this one again?

18         MS. JONES:  The DNA was not tested -- was not --

19   the DNA test was not verified by a director.

20         THE COURT:  So really where you want to start is

21   up there at the top where it says the DNA match contained in

22   the MSP crime lab exam for 08440 used at trial by prosecutor

23   violates due process.

24         THE DEFENDANT:  Yes.

25         THE COURT:  So you want that to be the heading and

1    then you can argue both 2-508 and 2-510.

2                    THE DEFENDANT:  Yes.

3                    THE COURT:  Got that, Mr. Fitzgerald?  That's our

4    heading.

5                    MR. FITZGERALD:  Yes.

6                    THE COURT:  Okay.  So this is going to be the

7    heading, very good.  And you're going to raise both issues

8    under both Statutes, right?

9                    THE DEFENDANT:  Yes.

10                   THE COURT:  Okay.  The next one, this is the one

11   filed August 29th.

12                   MS. JONES:  Correct.

13                   THE COURT:  You have issues page 2 of 19, 4A, B

14   and C is what you want me to decide.  Petitioner is denied due

15   process of law when the Assistant State's Attorney used

16   evidence obtained without probable cause of unreasonable

17   search and seizure.

18                   THE DEFENDANT:  Yes.

19                   THE COURT:  B, Petitioner is denied due process of

20   law when the Assistant State's Attorney obtained a second DNA

21   sample, et cetera.

22                   C, the suppression court's fact finding denied

23   Petitioner due process of law.

24                   Those are the three issues from that one; is that

25   right?

1          MS. JONES:  Is that right?

2          THE DEFENDANT:  Right.

3          MS. JONES:  That's it for that.

4          THE COURT:  Got that, Mr. Fitzgerald?

5          MR. FITZGERALD:  Yes, Your Honor.

6          THE COURT:  Okay.  And then issues from 9-10-12

7    are, under 4, Petitioner is denied due process of law to

8    obtain effective assistance of counsel pursuant to the Sixth

9    Amendment to the Fourteenth Amendment of the Constitution of

10   the United States.  And then you elaborate on that in your

11   facts, but that's the heading you want me to do, correct?  Or

12   am I incorrect?

13         THE DEFENDANT:  Correct.

14         THE COURT:  Okay.  And then the next one begins on

15   page 2 -- or is it page 8 of 20.  Well, page two has

16   allegations of error and lists four things under it.

17         MR. FITZGERALD:  Your Honor, I belive that was

18   from the appellate court.

19         THE COURT:  This says allegations of error

20   includes, one, Petitioner is denied due process of law under

21   the United States Constitution of the Sixth and Fourteenth

22   Amendment; that's not his allegations of error?

23         THE DEFENDANT:  That is my allegation.

24         MR. FITZGERALD:  I'm sorry.

25         THE COURT:  There's nothing about the appellate

```
 1    court in here.

 2              MS. JONES:  Not on this one.

 3              MR. FITZGERALD:  I'm sorry, I can't look at it so

 4    I don't know.

 5              THE COURT:  Okay.

 6              MS. JONES:  This has to do with the wrongful

 7    condition of the DNA evidence used by the State pursuant to

 8    Annotated Code of the Maryland Section 8-201 DNA evidence post

 9    conviction review.

10              THE COURT:  What page are you on?

11              MS. JONES:  I'm on page 2.

12              THE COURT:  2 of 12?

13              MS. JONES:  2 of 12, correct.

14              THE COURT:  And under four.

15              MS. JONES:  Yes.

16              THE COURT:  Okay.  I see.  No, I don't see

17    anything about -- here's what I have.

18              MS. JONES:  Are we on the same page?

19              THE COURT:  I'm sorry if I'm losing you.

20              Page 2 of 4.  The last line before number four is

21    on April 8, 2009, the Court sentenced Petitioner to concurrent

22    life plus an additional consecutive ten years.  Then number

23    four is, number four, allegations of error includes:  one,

24    Petitioner is denied due process of law under the United

25    States Constitution of the Sixth and Fourteenth Amendments of
```

```
 1    the confrontation clause and Maryland 4-252 section --
 2            MS. JONES:  I'm looking at something different.
 3            THE COURT:  Okay.
 4            MS. JONES:  Which date is that?
 5            THE COURT:  I thought it was -- oh, this is
 6    December 27th.
 7            MS. JONES:  Oh, no wonder.
 8            THE COURT:  Okay, let's back up.  Was I supposed
 9    to be on -- did we do September 10th yet?
10            MS. JONES:  Yes.  That's where the issue was
11    really, the substitution of counsel issue.
12            THE COURT:  September 10th is, I have page 4, page
13    9 and page 10.  Issue is page 9.
14            THE DEFENDANT:  Page 7 and 9.
15            THE COURT:  Well, I didn't write down page seven
16    before.
17            MS. JONES:  Your Honor, which one are we on right
18    now?
19            THE COURT:  September 10th.
20            MS. JONES:  September 10th.  On page eight I have
21    highlighted the violation was not giving notice of
22    substitution of new counsel.
23            THE COURT:  Where does it say that?
24            MS. JONES:  Fourth line down.  First Petitioner's
25    trial counsel was ineffective under the Sixth Amendment --
```

1           THE COURT:  Okay.

2           MS. JONES:  -- and denies Petitioner due process

3   of law under the Fourteenth Amendment of the U.S. Constitution

4   by not giving him notice of substitution of new counsel.

5           THE COURT:  So that's an issue.

6           MS. JONES:  That's an issue.  And I believe that

7   that's the only issue in the one filed on September 10th.

8           THE COURT:  So there's one issue.

9           MS. JONES:  I take that back, I'm sorry.  I'm

10  sorry.  There's a second issue on page 9 of 12.

11          THE COURT:  Okay, I have that, too.

12          MS. JONES:  Not pursuing DNA match under 5-208.

13          THE COURT:  Well, Petitioner's trial counsel by

14  not pursuing a DNA match, defense that is available under

15  Maryland Code Public Safety.  So there are two issues in that

16  one, one's found on page 8 and one is found on page 10.

17          MS. JONES:  And then the third issue on page 10

18  was Petitioner's trial counsel renders ineffective assistance

19  of counsel under the Sixth Amendment of the Constitution by

20  improperly arguing a judgment of acquittal conceding that

21  evidence presented by the State was sufficient to prove a

22  breaking.

23          THE COURT:  Okay.  So there are three issues,

24  right?

25          MS. JONES:  Correct.

```
 1                    THE COURT:  Page 8, page 9 and page 10.

 2                    MS. JONES:  Yes.  Right?

 3                    THE DEFENDANT:  Right.

 4                    MS. JONES:  That takes care of September 10th.

 5                    THE COURT:  So we'll now go to the next one I have

 6       is November looks like 19th that was filed, or November 13th.

 7                    MS. JONES:  It's date stamped the 13th at the

 8       bottom.

 9                    THE COURT:  Right.

10                    The issue is on page 2.  Allegation of error, that

11       also has to do with DNA.

12                    MS. JONES:  Correct.  That has to do with the DNA

13       under --

14                    THE COURT:  8-201(b).

15                    MS. JONES:  -- 8-201.

16                    THE COURT:  Okay.  And then the one on 12-27, the

17       most recent one filed.

18                    MS. JONES:  Uh-huh.  And these allegations of

19       error are listed on page 2 of 12.

20                    THE COURT:  1, 2, 3, 4.

21                    MS. JONES:  Uh-huh.

22                    THE COURT:  Okay.  So 1 through 4.

23                    MS. JONES:  Correct.

24                    THE COURT:  Okay, thank you very much.

25                    MS. JONES:  Okay, thank you.
```

1          THE COURT:  All right.  So those are the issues.

2    Are you ready to proceed now?

3          MS. JONES:  Okay.  Now what I would -- that's the

4    way I see them, yes.

5          THE COURT:  Thank you.

6          You got that, Ms. Dykes?

7          MS. DYKES:  I think so, Your Honor.

8          THE COURT:  Okay.

9          MS. JONES:  Thank you, Your Honor, for your

10   patience.

11         I would then, unless the State has some opening

12   comments, I would ask Mr. Quesenberry to run through these and

13   briefly try to state -- I believe, I think Judge Seaton gets

14   most of them but if there's anything you wish to expound.

15         THE COURT:  Well, let's let him take the witness

16   stand and he can testify.

17         MS. JONES:  Do you went to go up and do that, then

18   I'll run through these questions.

19   _____

20   Whereupon,

21                   PATRICK J. QUESENBERRY,

22   the Petitioner previously having been duly sworn, according to

23   law, was examined and testified as follows:

24                    DIRECT EXAMINATION

25         THE COURT:  You're already under oath, sir.



1          THE WITNESS:  Okay.

2          THE COURT:  Go ahead, you may ask him questions.

3    BY MS. JONES:

4          Q.    Mr. Quesenberry, just wanted to ask you how old

5    you are now.

6          A.    I'm 44.

7          Q.    Okay.  And how far did you go in school?

8          A.    Ninth grade.

9          Q.    Okay.  Do you have any formal legal education?

10         A.    No.

11         Q.    Have you been studying on your own?

12         A.    Yes, through case law.

13         Q.    Are you on any medications that could affect your

14   understanding today?

15         A.    No.

16         Q.    Have you ever been diagnosed with any mental or

17   physical illness that could affect your understanding today?

18         A.    No.

19         Q.    And we had a video conference, it's been sometime,

20   in April, April 17, 2012, I believe.

21         A.    Yes.

22         Q.    And we've exchanged a lot of correspondence since

23   then and you filed many petitions.

24         A.    I've been corresponding with letter with you, yes.

25         Q.    Okay.  And you understand as Judge Seaton has

1      already told you, you have one chance at post conviction

2      today.

3              A.      One chance.

4              Q.      Now has everything that you wish to raise been

5      raised as we discussed this morning?

6              A.      The 911 call.

7              Q.      The 911 call.

8              A.      Is the mystery somehow.  I've been trying to

9      pursue the 911 call and the Maryland Public Information Act

10     and I don't -- to my understanding I don't know how to pursue

11     that.

12             Q.      Okay.

13             A.      And that's the only allegation of error and I'd

14     rather go get that --

15             Q.      Well, let's start with that then.  With the 911

16     call.  There was a 911 call that Mrs. Sifford had called, and

17     the police responded and they found you, is that correct?

18             A.      Yes.

19             Q.      Okay.  How would that 911 call change the outcome

20     of the case?

21             A.      Because probable cause must be -- there's three

22     components to probable cause, veracity, reliability and basis

23     of knowledge, Illinois versus Gates.

24             Q.      Okay.

25             A.      And his information is unidentified.  Based on

1    totality of the circumstances I believe that if I was given

2    the opportunity to obtain that 911 record that I could cast

3    doubt, that I could have a Franks Delaware hearing, that his

4    information was false and erroneous.

5           When a police officer lies regarding probable

6    cause, even though he shouldn't have because the victim said

7    she knew me, so there's no reason for him to phantomize or put

8    in dispatch advised that a white male and shorts on and no

9    shirt walking down the street of Hammond Street that night.

10          Q.    Let me just ask you this, you're not sure that

11   Mrs. Sifford would have described you that way?

12          A.    Yeah, because in her testimony she never believed

13   her daughter, so she never saw me.  If Michelle Sifford said

14   there was a man in her bed, then she would have related that

15   to Christine Sifford.  Christine Sifford testified that she

16   never saw the man and sent her back to bed.  Then she realized

17   something was amiss as stated in your statement of facts.  So

18   it's a mystery, it's an unsolved mystery.

19          Q.    So you think that the 911 would have changed --

20   there would have been no probable cause if you had -- strike

21   that.

22          THE COURT:  I don't understand what the relevance

23   of the 911 call is.  So if that's what you're asking --

24          MS. JONES:  Yes.

25          THE COURT:  -- go ahead and ask another question

1    because I'd like to understand.

2    BY MS. JONES:

3         Q.    Well, I don't understand what the relevance of the

4    911 call would be to the outcome of the whole trial.

5         A.    He never had a description of a white male of me,

6    naming me as the suspect.  His description is a white male

7    wearing blue shorts no shirt.  He detained me.

8         Q.    Okay.

9         A.    And then it says in the statement of probable

10   cause specifically then later identified as Patrick J.

11   Quesenberry.

12        Q.    Okay.

13        A.    And the girl suffers from mental defectiveness.

14        Q.    Yes.

15        A.    And her mind would be altered by the officer

16   standing in front of her saying is that the man, especially

17   with handcuffs on that night.

18        Q.    Okay.  So then you're also saying --

19        A.    He trumped up his own probable cause statement of

20   a description and detained me.  I used to live on Hammond

21   Street so I'm allowed to walk on that street.

22        Q.    Okay.

23        A.    That's not probable cause.  That's just not

24   probable --

25        Q.    So you're saying that there was no probable cause

1    to arrest you?

2        A.    Yes.  And had I had the information of the 911

3    call, I could have raised a Franks Delaware hearing and

4    challenged his probable cause.

5        Q.    A what hearing?

6        A.    A Franks Delaware hearing, a 1978 Supreme Court

7    case where if you can challenge the probable cause information

8    of his statement, in that statement of probable cause then the

9    magistrate might not detain me.

10       Q.    Okay.

11       A.    So the 911 call would cast doubt if I would be

12   able to obtain that 911 call.

13       Q.    Okay.  So you feel --

14       A.    I'll go back to North Branch right now if they let

15   me have that 911 call.

16            THE COURT:  What is it that -- I don't quite

17   understand what post conviction relief he's seeking for the

18   911 call.  Can you elaborate on that?

19            MS. JONES:  Mr. Quesenberry appears to be stating

20   that the Judge made a bad ruling on the --

21            THE DEFENDANT:  The police.

22            MS. JONES:  I'm sorry?

23            THE DEFENDANT:  The police.

24   BY MS. JONES:

25       Q.    I know, but had -- you're challenging the Judge's

1 ruling on probable cause in general?

2    A. (Shaking head in the negative.)

3    Q. You're not?

4    A. (Shaking head in the negative.)  No.

5    THE COURT:  You have to answer out loud.

6    THE DEFENDANT:  Police Officer Scott Willey of the

7 Salisbury Police Department put in there dispatch advised a

8 white male wearing blue shorts, no shirt, and he detained me.

9 And who is the dispatch?  It's not radio dispatch as like

10 radio car dispatch, so I can reasonably conclude during trial

11 she made a 911 call and that was not disclosed under the

12 specific searches and seizures of 4-263 section lower case

13 (d)7 specific searches and seizures and pretrial

14 identification of a witness, a state witness specifically in

15 this case.

16 BY MS. JONES:

17    Q. So you feel this wasn't disclosed?

18    A. It was never disclosed.

19    Q. It was not disclosed to you.

20    A. And I don't know if a 911 call is discovery under

21 4-263 lower case d without the necessity of a request.

22    Q. So you believe that there was no probable cause

23 for arrest and therefore Judge Jackson made a bad ruling?

24    A. No, no judge about it.  No judge is involved.

25    Q. No judge is involved.  There was just no probable

1      cause to arrest.

2           A.    Statement of probable cause on August 11, 2008.  I

3      think it was around 8:00 he stated in his statement of

4      probable cause the first paragraph.

5           Q.    So there was no probable cause to arrest you and

6      therefore everything else should fall.

7           A.    Yes.

8           Q.    Or the indictment should be withdrawn or you

9      shouldn't be charged?

10          A.    Yes.  I want to prove that he's perjury and he

11     made a perjurious statement under the penalties of perjury as

12     signed down by the bottom of all three pages of that statement

13     of probable cause that he advised that dispatch was -- it was

14     a white male wearing no shirt, blue shorts, and he detained

15     me.  The second sentence he clearly states that I was later

16     identified as Patrick Quesenberry.

17          Q.    Right.

18          A.    And case law in like 1970 they specifically state

19     that it should be radio dispatch and probable cause can be had

20     on collective knowledge if say probable cause from another

21     officer describes me.  Just as like in State versus Demetrius

22     Daugherty there was a 911 call on that facts in that

23     proceedings that the Oxon Hill Police responded to a robbery

24     by a 911 dispatch advisement of the description and that's how

25     they catched the --

1          Q.    So you feel that the 911 call was not disclosed.

2          A.    Yes.

3          Q.    And that Officer Willey developed his statement of

4    probable cause on mistaken information?

5          A.    He trumped it up.  He fabricated it, it's phantom.

6          Q.    Okay, all right.

7          A.    And that's not --

8          Q.    And therefore you would ask this post conviction

9    court to vacate the charges.

10         A.    Don't decide nothing, let me have the 911 call and

11   then come back later.

12         Q.    Okay.  So you would like to ask the Judge to have

13   another hearing for post conviction based on --

14         A.    Don't decide nothing until I get the --

15               THE COURT:  Whoa, well, wait a minute.

16               MS. JONES:  If that's what you're asking, because

17   that's not going to happen.

18               THE COURT:  I'm very confused, maybe counsel can

19   help me.  Do we know there was a 911 call?

20               MS. DYKES:  Your Honor, going from memory, I don't

21   believe that the 911 call was ever -- it was never secured.  I

22   never got a recording of it, is my recollection at this point

23   in time.  I'd have to go through all this discovery.

24               THE COURT:  So there's a 911 call and it's

25   directed to the police station and the police dispatch calls

1   Officer Willey, is that the way it worked?

2           MS. DYKES:  That's my -- not having fully reviewed

3   the facts in this case, Your Honor, that's my understanding.

4   The State's position, Your Honor, is that this allegation,

5   there's no legal basis for any relief.

6           THE COURT:  Well, he's basically asking for a

7   postponement until we can get this 911 call.

8           THE DEFENDANT:  Yes.

9           THE COURT:  I can't understand any basis for

10  granting a postponement to get the 911 call.  I can't see how

11  the 911 call is even relevant to anything you're alleging.  So

12  I'm happy to hear from you, counsel, but I don't understand

13  the argument even.

14          He was going to get the transcript of this 911

15  call to undermine what?

16          THE DEFENDANT:  Perjury.

17          MS. JONES:  That what?  Pardon me, Your Honor.

18          THE COURT:  If somebody calls 911.

19          THE DEFENDANT:  And they give a description.

20          THE COURT:  And then that's given out to an

21  officer who goes to look for someone meeting that description.

22  That's what you say happened.

23          THE DEFENDANT:  And I never was disclosed that 911

24  call under 4-263 section D number 7A and B.  I'm entitled to

25  all information regarding searches and seizures and pretrial

```
1   identification under that.

2           THE COURT:  So that's an error but I'm not going

3   to post -- and you didn't get it.

4           THE DEFENDANT:  And I didn't get it.

5           THE COURT:  You're claiming that's an error.

6           THE DEFENDANT:  And it's post convict because you

7   can content several errors.  I could apply for a writ of

8   actual innocence which would set my verdict aside which would

9   be better than a new trial.

10          MS. JONES:  Well, you can do that.

11          THE COURT:  You can still do that.

12          MS. JONES:  At another time.

13          THE COURT:  Okay.  So I'm not going to grant a

14  postponement.  I've considered it, I'm not granting a

15  postponement to get the 911 call.  He can make his argument

16  about why that's something I should grant some relief on,

17  certainly, but I'm not going to.

18          MS. JONES:  Okay.

19  BY MS. JONES:

20      Q.    So the Judge has heard you and understands where

21  you're going.

22      A.    That's fine.  As long as you heard it, that's

23  fine.

24      Q.    Okay.  Now, on the post conviction petition that

25  you filed back in April of 2012, you are saying that there was
```

1    a due process violation of the DNA, there was a violation of

2    Section 2-510 --

3         A.    Yes.

4         Q.    -- and 2-508.  What would you like to tell the

5    Court about that?

6         A.    Well, first of all it's in the test results, if

7    you could turn to the test results.

8         Q.    Uh-huh.  Those are attached, yes.

9         A.    In the first page.

10             THE COURT:  Which one is this, which date?

11             MS. JONES:  This is the one from April, it was

12   docketed April 30th.

13             THE COURT:  Okay.

14             THE DEFENDANT:  And this is from a forensic's

15   attorney named Jennifer Cline who works for the State of

16   Maryland Forensic Science Division, and she did test results

17   of two kits.  She found -- she clearly states that, in the

18   first paragraph below where it says the DNA profile reported

19   below were determined by procedures which have been validated

20   according to the Federal Bureau of Investigations.  And I want

21   to stop right there because DNA profiles has two definitions.

22   And under Section 2-501 definition --

23             THE COURT:  Let me stop you there.

24             (Whereupon, there was a discussion about

25        another case.)

1    THE COURT:  Okay, go ahead.

2    THE DEFENDANT:  Okay.  The DNA profile that she's

3    referring to is commonly known as DNA record number two.  DNA

4    record includes the information commonly referred to as a DNA

5    profile.

6    THE COURT:  Uh-huh.

7    THE DEFENDANT:  Under DNA record one, DNA record

8    means DNA information stored in CODIS or the statewide DNA

9    database system.

10    THE COURT:  Okay.

11    THE DEFENDANT:  Since we don't have an expert here

12    to tell us anything we have definitions that give a layman

13    comprehensive.  So the DNA profiles were testified that the 1B

14    and 1G and No. 2 were all found with DNA on it.  And it says,

15    it clearly states it on page four.

16    THE COURT:  I see.

17    THE DEFENDANT:  And refers to DNA profiles.  The

18    DNA from more than one individual was obtained from the bite

19    mark licking swabs collected from Michelle Sifford's breast

20    1G.  The DNA profile from the known standard of Patrick

21    Quesenberry two matches the major component of the DNA profile

22    obtained from this item at all genetic loci tested, except D7,

23    S820, D19, S433 and FGA.  To a reasonable degree of scientific

24    certainty Patrick Quesenberry is the source of the major

25    component of the DNA profile obtained from this item.

1              THE COURT:  Okay.

2              THE DEFENDANT:  And she based that on Caucasian

3     and African-American population data from unrelated

4     individuals.

5              THE COURT:  Okay.  You don't have to read the

6     whole thing to me, I have it right in front of me.

7              THE DEFENDANT:  Okay.  Well, I'm hoping that you

8     can conclude that there was no verification from the director

9     pursuant to 2-508(a).

10             THE COURT:  Okay.

11             THE DEFENDANT:  Made from the statewide database

12    as I submitted the DNA profile on January 21, 2006, while at

13    the annex.

14             THE COURT:  Okay.

15             THE DEFENDANT:  And under the law you're supposed

16    to send, to my understanding as like in State versus Raynes, a

17    2004 case.

18             THE COURT:  Okay, just tell me what happened, you

19    don't have to --

20             THE DEFENDANT:  Okay.

21             THE COURT:  I mean I want to hear everything you

22    have to say but your attorney is going to recite the law to

23    me.

24             THE DEFENDANT:  Okay.  Anyway, that's the evidence

25    right here along with another, I have a 48 page that was

1    included in this --

2              THE COURT:  I'm sorry, go ahead.  I wanted to get

3    that note out to Ms. Marsh.

4              THE DEFENDANT:  That's okay.

5              48 pages also are included in this, I wanted to

6    enter into evidence during sometime.  I got it right there.

7    BY MS. JONES:

8         Q.   Just to clarify, much of this was entered into

9    evidence at trial.

10        A.   Yes.

11        Q.   And Ms. Cline, the forensic scientist, she

12   testified.

13        A.   Yes.

14        Q.   So to break this down is your main contention that

15   no director verified Ms. Cline's work?

16        A.   Yes.  See under 258 under the (a)4 it describes a

17   person and a proceeding, and I have a right to request the

18   results to cast --

19             THE COURT:  I understand all that, you've told me

20   all that.

21             THE DEFENDANT:  Okay.

22   BY MS. JONES:

23        Q.   Okay.  So you're saying that the procedures

24   weren't followed under the rules.

25        A.   Yes.

```
 1                    THE COURT:  Was that raised on appeal, Ms. Jones?
 2                    MS. JONES:  No, this was not raised on appeal.
 3                    THE COURT:  All right.  Go ahead.
 4                    MS. JONES:  What was raised on appeal, just to
 5        have that clear, there were four issues raised on appeal, and
 6        I might as well put those into the record.  Was it error to
 7        admit into evidence over repeated objections and a motion to
 8        strike the expert opinion of the SAFE nurse who interviewed
 9        and examined the complainant that she personally believed the
10        rape complaint to be true.  Number two, was it error to admit
11        DNA evidence obtained without a warrant or other court order.
12        Three, was it error to admit appellant's statement made during
13        custodial interrogation.  And four, was the evidence
14        sufficient to sustain the convictions.  Those are the issues
15        that were raised on appeal.
16                    THE COURT:  Okay.
17                    MS. JONES:  Appellate counsel did not challenge
18        the testing of the DNA.
19                    THE COURT:  All right.  So I've got that issue,
20        the director didn't verify it, he claims that warrants post
21        conviction relief.
22                    Let me just do this.  It's almost quarter after
23        12, this has gone on now for sometime.
24                    MS. JONES:  Yes, I know.
25                    THE COURT:  I think we're going to go ahead and
```

1  take our lunch recess.

2          We're going to take a recess, you can step down.

3  And it's quarter after 12, so we'll take a recess until

4  quarter after one.

5          (Whereupon, there was a luncheon recess in

6     the proceedings.)

7          MS. DYKES:  Patrick Quesenberry, K-08-0824.

8          Ms. Jones is present, they're bringing

9  Mr. Quesenberry out.

10          (The Defendant entered the courtroom.)

11          THE COURT:  Mr. Quesenberry, you can retake the

12  witness stand and you're still under oath.

13          THE DEFENDANT:  All right, thanks.

14          THE COURT:  All right.  Do you remember where you

15  were?

16          MS. JONES:  I do actually.  I believe I do.  We

17  broke for lunch after we had finished talking about pro se

18  number two.

19          THE COURT:  Okay.

20          MS. JONES:  So we're onto pro se number three,

21  which is the petition that was filed August 29, 2012.

22  BY MS. JONES:

23     Q.    Mr. Quesenberry, as we discussed when we went

24  through these issues, and in the future if this happens again

25  I take the Court's admonishment, that would have been, in

1    fact, easier, I thought we had -- okay.

2         And on page two of the pro se petition of

3    August 29, 2012, you have three, you list three different

4    issues that you believe are allegations of error?

5         A.    Yes.

6         Q.    Okay.  And I'm going to read them then you can

7    describe what you would like to add to that.  Petitioner was

8    denied due process of law when the Assistant State's Attorney

9    used evidence obtained without probable cause of an

10   unreasonable search and seizure against Petitioner.  Okay.  So

11   what would you like to -- is there something you would like to

12   add to that?

13        A.    Well, I don't know what you mean add to it, I

14   thought we would read in the petition that, you know, there's

15   no probable cause from Scott Willey --

16        THE COURT:  Okay.  So this is basically the same

17   issue you had before.  Officer Willey didn't -- I'm sorry to

18   interrupt.

19        THE DEFENDANT:  No, this is an allegation I can

20   contend through post conviction that there was probable cause.

21   Chief versus State I can raise illegal search and seizure on

22   post conviction with the use of evidence that was objected to,

23   as in this case at trial.

24   BY MS. JONES:

25        Q.    Okay.  Now you had a probable cause hearing, is

1    that correct?  You had a suppression hearing.

2         A.    Yeah, during a DNA sample that was taken, but no

3    probable cause asserted under 42-52 --

4         Q.    So you're saying that you are challenging --

5         A.    The arrest.

6         Q.    The arrest.

7         A.    Yes.

8         Q.    Based on the 911 call?

9         A.    No.

10        Q.    No?

11        A.    The use of the DNA and the statements that were

12   obtained after the Miranda rights during the suppression

13   hearing that were used by the prosecutor during the trial of

14   February 24, 2009.

15        Q.    So you're saying the State had no probable cause

16   to arrest you?

17        A.    Scott Willey did not have no probable cause from

18   the Siffords.  During his testimony --

19        Q.    Okay.

20        A.    -- he testified that he was given information from

21   the Siffords, plural, but he didn't mention what Sifford gave

22   him the information.

23        Q.    Okay.

24        A.    It was changed -- he changed that story from the

25   statement of probable cause, which there was a preliminary

1    hearing on September 19, 2008.  So he switched his story, as

2    your statement of facts clearly state in your amended

3    petition.

4            Q.   Okay.

5            A.   He claims he was given information from the

6    Siffords, and there were four Siffords that live there, so

7    under Illinois versus Gates he had no probable cause to

8    arrest.  And it's just like Matt versus Ohio, that's what I'm

9    relying on.  That this could be raised under 7-106 section

10   (c).

11           Q.   The Judge knows the law.

12           A.   Okay.

13           Q.   So you don't need to do that.

14           A.   Well, I'm just getting where I know what I know.

15           Q.   Okay.  That's fine.

16                I'm sorry, I gave Mr. Russell the wrong thing to

17   take to the Clerk's Office.

18                THE COURT:  Have you finished explaining that one?

19   Are you ready to tell me the next one?

20                MS. JONES:  Yes.

21                THE COURT:  Okay.

22   BY MS. JONES:

23           Q.   The next one is Petitioner was denied due process

24   of law when the State's Attorney obtained the second DNA

25   sample from him, pursuant to Maryland Public Safety Article

1    2-504.  Does this have to do with when the officer came to the

2    detention center to take your DNA sample?

3         A.    Yeah, sort of, yes.  But I'm going on due process

4    of law, Fourteenth Amendment of the Constitution, United

5    States Constitution.

6         Q.    Okay.  So you're saying that was a violation when

7    they came to take your DNA?

8         A.    Under the provision of section D, you're only

9    allowed one DNA sample sufficient for the DNA database court

10   ordered by the Court.  And here the second DNA sample that

11   they obtained was not needed because they had knowledge that

12   my DNA was already in the statewide data base January 21,

13   2006.

14        Q.    Okay, so there was already one -- your sample was

15   in there from a prior arrest, right?

16        A.    Yes, while I was doing time at ECI annex

17   January 21, 2006, I submitted to the statewide database,

18   Maryland DNA database.

19        Q.    So you're saying the second DNA sample was

20   unnecessary?

21        A.    Not necessary, not needed.

22        Q.    Not needed and a denial of your due process; is

23   that right?

24        A.    Yes.  Under that section provision, section D,

25   second DNA sample.



1        Q.    Now C, the suppression court's fact findings
2   denied you due process under section 2-202(c)?
3        A.    Yes, the opinion and order is evidence.
4        Q.    Okay.  So you're contesting --
5        A.    Yes.
6        Q.    -- the Judge's order?
7        A.    Yeah.  He made probable cause determination based
8   on the Officer Thomas McMenamy and he put Officer Richard
9   Engle, which is a newscaster's name, for the NBC, and I don't
10  know what that has to do but it's opinion.  Richard Engle that
11  I knew is a news anchor for NBC doing a report in Syria.
12       Q.    So are we pretty much done with that one now?
13       A.    Just there was no probable cause under Section
14  202, Maryland Code 2-202 warrantless arrest section C.  An
15  officer must have probable cause to believe what crime
16  committed.
17       Q.    Okay.
18       A.    And he never stated during that proceeding what
19  crime was committed.  And that's also noted in the opinion
20  because the Judge said alleged crime.  And under the Maryland
21  Code Section 202-02 warrantless arrest section C, that's not
22  permitted.  And I stated State versus Wallace.
23       Q.    All right.  Now under the next petition that you
24  filed, which it looks like it was received by the State on
25  September 10, 2012.  On page 8 of 12, you say you're concerned

1  that it was a due process violation for Mr. Murray not to file

2  a notice of substitution of counsel when Mr. Podlas left your

3  case.

4      A.    Yes.  I'm contending the law that I have nothing

5  on record for me to verify that he gave notice to the Clerk

6  pursuant to Maryland 214 section B, extent of duty of counsel.

7      Q.    So there was a rule violation.

8      A.    Yeah.  Under the rule counsel can, what do they

9  call it, take over for the counsel if he gives notice to the

10  Clerk.  I have nothing on docket entries that state, although

11  he did give me a piece of paper stating substitution of

12  appearance and that I have in my files.

13      Q.    All right.  Okay.  So then on the next page, on

14  page nine, you allege Petitioner's trial counsel constitutes

15  both deficient performance and prejudice as a result of

16  ineffective assistance of counsel pursuant to the Sixth and

17  Fourteenth Amendment by not pursuing a DNA match defense

18  that's available under Public Safety Article 2-508.  What is

19  it that you're alleging here?

20      A.    That a reasonable competent attorney would have

21  pursued a DNA defense under that section.

22      Q.    Okay.

23      A.    Given that the DNA that the State's Attorney

24  contend was inevitable discovery.  He had that before the

25  motions hearing, that he would be able to rebut the DNA.   In

1    this case the Judge clearly stated to him the searched case

2    information as noted in the docket entries.

3         Q.   Are you alleging that there was a mistake in the

4    results of the DNA?

5         A.   It could have been rebutted by pursuing a Public

6    Safety 258(b) availability to Defendant, that he could search

7    the database statewide and see if there was a match between

8    the statewide to my DNA and rebut the DNA that could have been

9    suppressed.

10        Q.   Let me ask you again, are you alleging it was not

11   your DNA?

12        A.   It's my DNA.

13        Q.   Okay.  On the victim?

14        A.   Yes.

15        Q.   Okay.

16        A.   On the victim, with the use of my DNA buccal swab

17   that they swabbed from me on October 3, 2008.

18        Q.   Right.  So you're alleging that they should have

19   looked further for someone else's DNA?

20        A.   They should have sent the sexual assault kit first

21   to the Maryland Crime Lab, made a match to my DNA that was in

22   the statewide database first.

23        Q.   Okay.

24        A.   Make a match.  And if it was a match, the

25   appropriate measure is they would have a match to the

1    statewide database profile taken from me while at the ECI

2    annex January 21, 2006.  And if they got a match --

3         Q.    So you're saying that the first DNA that was taken

4    when you were at the annex on the prior case and the one that

5    was taken again, it should have been corroborated that they

6    matched?

7         A.    Yes, that's the law of Maryland.  DNA collection

8    laws.

9         Q.    Okay.  And the law was violated in that regard.

10        A.    Yes, the civil statute in Public Safety.

11        Q.    Okay.  And the last allegation that you raise here

12   was basically ineffective assistance of counsel by arguing the

13   motion for judgment of acquittal conceding that there was a

14   breaking.  You have a problem with that, that Mr. Murray

15   conceded there was a breaking into the house?

16        A.    Yes.  His motion of acquittal was prejudiced to my

17   sufficiency of evidence on appeal as discovered.  On appeal

18   Mr. Peabody, the appellant attorney, would not allow me to

19   raise the other first degree burglary regarding to the

20   offenses of 8-11-2008, which was a first degree burglary, and

21   I was found guilty of a second degree assault.  During that

22   period, this would be count 15, there was no testimony of

23   intent to steal or a crime of violence to convict me under

24   first degree burglary.  And the unreported opinion clearly

25   shows that his motion of acquittal prejudiced my defense on

1    that.

2         Q.     Okay.  So had that been raised the appellate

3    counsel could have raised it on appeal.

4         A.     He would not raise it, and I sent a letter, I have

5    a letter where he clearly states that in Maryland, that I

6    could only raise issues that my lawyer raised by motion or

7    objection.

8         Q.     Okay.

9         A.     And he did not announce anything else.

10        Q.     Okay.  Now moving along to --

11               THE COURT:  I think we're up to November 13th.

12               MS. JONES:  November 13th, exactly, what I have as

13   number five.

14               THE COURT:  That I have numbered the same, by the

15   way.

16               MS. JONES:  Okay.

17               THE COURT:  So that allegation is on page 2 of 12.

18               MS. JONES:  Correct.  And that is what I have as

19   well.

20   BY MS. JONES:

21        Q.     And you're saying here that you were denied due

22   process of law because you could raise your case under Section

23   8-201 of the post conviction DNA evidence Post Conviction

24   Statute.

25        A.     Yes, I can claim unlawful conviction or grant a

1   new trial.  I contended specifically a new trial in section C,

2   new trial, and section D, findings requiring DNA testing of

3   the Criminal Procedures.

4         Q.    Okay.

5         A.    And this is where I got confused, I did put 2-510

6   use of match, that's due to my pro se --

7               THE COURT:  But you mean 8-201.  What did you

8   mean, what section did you mean?

9               THE DEFENDANT:  Public Safety 2-510, use of a

10  match as evidence.

11              THE COURT:  All right.

12              THE DEFENDANT:  That's my pro se, I'm sorry to put

13  that in there but I did.

14  BY MS. JONES:

15        Q.    That's okay.  That is all right.  So that's your

16  allegation of error --

17        A.    Yes.

18        Q.    -- that this should be raised under that Statute.

19        A.    Yes.

20              THE COURT:  Okay.

21  BY MS. JONES:

22        Q.    Okay.  Then the last one was, it looks like it was

23  received by the Court on December 27, 2012.

24              THE COURT:  Number six.

25              MS. JONES:  Correct.

1    BY MS. JONES:

2         Q.    And on page 2 of 12 there are basically four

3    allegations.

4         A.    Yes.

5         Q.    All right.  Petitioner is denied due process of

6    law under the Constitution Sixth and Fourteenth Amendments and

7    Maryland Rule 4-252 section E, content of the criminal causes

8    on the suppression hearing Judge's probable cause

9    determination, noted in his opinion and order ruling.

10        A.    Uh-huh.

11        Q.    Again are you suggesting that the Judge made an

12   error in ruling that there was probable cause?

13        A.    Yeah.

14             THE COURT:  Well, I note he's referring me to page

15   seven and I've read that.

16             THE DEFENDANT:  The special circumstances -- there

17   are special circumstances that exist to excuse the waiver, the

18   facts here are stated that when he gave an opinion on

19   February 20, 2009, it stated in there that he found probable

20   cause of the officers.  And I know specifically he denied that

21   February 6th motion on 2009 regarding Miranda rights, Officer

22   McMenamy and Officer Burt.  And never did once during that

23   proceeding did he state anything about probable cause.  So

24   this violates my confrontation clause and Maryland 4-252(e)

25   content, because a motion alleging illegal source of

1  information as a basis for probable cause must be supported by

2  precise and specific factual averments.  And that's what I

3  contend that the Sixth and the Fourteenth Amendment of the

4  United States that I'm denied to that.  And I cited Pointer

5  versus Texas.

6  BY MS. JONES:

7       Q.    Now the next part it looks like it's similar to

8  what you just said in number two, Petitioner was denied due

9  process of law under the Sixth and Fourteenth Amendments to

10 have compulsory process for obtaining witnesses in his favor

11 due to the suppression hearing Judge's opinion and order.

12      A.    Yes.  I do that because he contended that Vertus

13 Humphries, the correctional officer, testified for the State

14 and that I called no witnesses.  On appeal the Maryland Court

15 of Special Appeals will only view the record that he issued

16 and not the trial record.

17      Q.    Okay.

18      A.    And this is like a denial of due process of law

19 that my compulsory process was not being honored for obtaining

20 witnesses in my favor due to that opinion.

21      Q.    But the officer testified for the defense, isn't

22 that correct?

23      A.    Yes.

24      Q.    And the Judge misspoke?

25      A.    The Judge issued an opinion clearly on the first

1   paragraph of the opinion that he clearly states that Vertus

2   Humphries, the correctional officer from Wicomico, testified

3   for the State.

4       Q.    Okay.

5       A.    And her testimony was relevant to the consent

6   issue that she told -- that was the law, and this would help

7   my defense on the consent issue.  But the Court of Special

8   Appeals doesn't recognize the record, they give him deference,

9   what they say, deference, and they only rule on his opinion.

10  So I cited Washington versus Texas, 1967, comparing that case.

11      Q.    Okay.  And let's see, now the next issue that you

12  raise was number three, was Petitioner is denied due process

13  of law under the Fourteenth Amendment pursuant to Maryland

14  Rule 4-401(b) following DNA testing because of the State's

15  composed DNA test results.

16      A.    Right.

17      Q.    Okay.

18      A.    And I'm prejudiced to show favorable DNA testing

19  results following DNA testing pursuant to Maryland Rule 4-401

20  Section B following DNA testing under criminal causes because

21  of the State's composed DNA test results.  They were not

22  verified by director pursuant to 2-508.

23      Q.    Okay.

24      A.    They were not confirmed with additional testing,

25  pursuant to Public Safety Article Section 2-510, use of a

1    match, and under these circumstances a court reviewing for DNA

2    to claim my innocence will not open up another proceeding

3    under this rule, will not be able to do so because of the way

4    they composed that.

5           Q.    Are you alleging that there was a mistake in the

6    DNA testing or -- was there a mistake in the DNA testing, to

7    your knowledge?

8           A.    I can't say that, because it's expert, and I have

9    no -- I'm a layman and I can't --

10          Q.    Okay, that's fair.

11                I should withdraw that question actually.

12                THE COURT:  All right.  The question is withdrawn.

13                MS. JONES:  So those are all the --

14                THE COURT:  We covered the last one.

15                MS. JONES:  Oh, the last one, we already covered

16   the discovery of the 911, we talked about earlier this

17   morning.

18   BY MS. JONES:

19          Q.    So those are all the allegations that you have

20   presented to the Court.

21          A.    (Nodding head in the affirmative.)

22          Q.    Is that --

23          A.    Is that how this is done?  I thought I would start

24   reading all this.

25          Q.    Well, Judge Seaton has everything to read.

```
 1        A.     Okay.

 2               THE COURT:  Right, you don't have to read it to me

 3     again.

 4               THE DEFENDANT:  Oh, so you take it back, okay.

 5     That's fine with me.

 6               THE COURT:  I had it ahead of time, too.

 7               THE DEFENDANT:  It saves me a lot.

 8               MS. JONES:  That's all the questions I have.

 9               THE COURT:  Well, you didn't ask him anything on

10     your petition, did you?

11               THE WITNESS:  The legal arrest.

12               THE COURT:  Or were you planning to ask him?  If

13     you don't need to, you don't need to.

14               MS. JONES:  I would not.

15     BY MS. JONES:

16        Q.     Well, let me just ask since we have you here.  Is

17     there anything on the amended petition that I wrote

18     concerning --

19        A.     You're going to ask to set aside --

20        Q.     Correct.

21        A.     -- because it should have been merged.

22        Q.     Correct.

23        A.     And I just wanted to bring the Judge's attention

24     that under Section 6-218(d), credit when one or multiple

25     innocence set aside, a Defendant who is serving multiple
```

```
 1    sentences, one of which is set aside as a result of direct or

 2    collateral attack, shall receive credit against a reduction of

 3    the remaining term of a definite or life sentence or the

 4    remaining minimum or maximum term of --

 5         Q.    And I will put that into argument.

 6         A.    Okay.

 7         Q.    And just to make sure, you choose to waive or

 8    withdraw the three judge panel?

 9         A.    Yes, three judge panel.

10         Q.    But would you like to pursue a motion for

11    reconsideration of sentence?

12         A.    Right.

13         Q.    Belatedly if the Judge agrees.

14         A.    Yes.

15              MS. JONES:  That's all the questions I have, Your

16    Honor.

17              THE COURT:  All right, thank you, you may step

18    down -- oh, sorry, don't step down.

19              No questions?

20              MS. DYKES:  No, Your Honor.

21              THE COURT:  I'm sorry, she looked like she was

22    waving her hand.

23              You may step down, there's no cross.

24              MS. JONES:  I have no further witnesses.

25              THE COURT:  Do you have a witness?
```

1          MS. DYKES:  No, Your Honor.

2          THE COURT:  Oh, okay.

3          MS. DYKES:  I would ask Your Honor take judicial

4   notice of the entire contents of the case file, all the

5   exhibits entered at trial, and that includes the DNA report.

6          THE COURT:  Any objection if I do that, Ms. Jones?

7          MS. JONES:  Take the entire -- no, no.

8          THE COURT:  All right, so ordered.

9          Are you ready for closing?

10         Can I impose on you, counsel, within 30 days, I

11  think we got a list of what we got to decide, would it be

12  possible for you to submit to me within 30 days a list of all

13  the headline issues?

14         MS. JONES:  Yes, and I will take those just as we

15  discussed them.

16         THE COURT:  Give it to Ms. Dykes and see if the

17  two of you agree, and if you don't agree let me know.

18         MS. JONES:  Absolutely.

19         THE COURT:  That will be most helpful, and I will

20  work diligently.  But I want to hear closing.

21         MS. JONES:  And I know your law clerk will be -- I

22  understand, and this does happen.

23         THE COURT:  Well, I don't want to get to the end

24  of the day or spend a lot of time issuing an opinion and have

25  left out an issue because of somewhat confusing proceedings

1    that occurred as we tried to clarify what the issues were.

2              MS. JONES:  And just so you'll know,

3    Mr. Quesenberry, anything that I will give to the Court and to

4    the State you of course will have a copy, and I will send it

5    to you.

6              THE DEFENDANT:  Right.

7              MS. JONES:  Everything that we discussed that's on

8    the record now, each page that we went through, okay?  All

9    right.

10             THE DEFENDANT:  Uh-huh.

11             MS. JONES:  Now with these, I will do that and the

12   Court can issue its opinion based on testimony taken today.

13             THE COURT:  Okay.  Do you wish to make any

14   arguments?

15             MS. JONES:  I do.  I believe it's all, just on the

16   amended petition, and I believe -- I hope it's pretty clear in

17   the petition that the Utter case, Utter versus State case --

18             THE COURT:  Correct.

19             MS. JONES:  -- does merge those two.

20             THE COURT:  Well, that's my question.  What

21   happens then?  What would be the relief?  If I agreed with you

22   what would be the relief?

23             MS. JONES:  The relief would be that the first,

24   the burglary conviction would be vacated.  Mr. Quesenberry

25   would still have the life sentence on the rape case, but the

1   burglary would be vacated because it really merges into the

2   rape.

3          THE COURT:  It wouldn't just be sent back, It

4   would merge?  I wouldn't have to vacate it and send it back to

5   the sentencing judge to do anything?

6          MS. JONES:  Well, you know, I think you would

7   because he would have to have a resentencing.  And what

8   Mr. Quesenberry was alluding to is the way that he was

9   sentenced it's kind of an odd -- usually it would be life plus

10  something.  In this case what the Court did is, and this is on

11  page 23 of the sentencing transcript, the sentence is based on

12  the findings he rendered in count one of the indictment, first

13  degree burglary, the sentence he imposed is 10 years in the

14  Division of Correction.  We'll date that sentence from the

15  period of his incarceration so he receives full credit.  Well,

16  if that gets vacated, what, was it Judge Mitchell, believe?

17         THE DEFENDANT:  David B. Mitchell.

18         MS. JONES:  Mitchell, yes.

19         THE DEFENDANT:  The Honorable David B. Mitchell.

20         MS. JONES:  Mr. Quesenberry is saying he would be

21  getting credit, if that's vacated he should still get the

22  credit because of the days he served on that first part of the

23  sentence.  But I don't think at the end of the day it's not

24  going to make an appreciable difference.

25         THE COURT:  Okay.

1    MS. JONES:  But it would be vacating the burglary

2    count, so he would be serving not life plus 10 or 10 plus life

3    the way it was sentenced but rather life.

4         THE COURT:  So you would ask me to vacate it and

5    send it back to the sentencing judge for resentencing.

6         MS. JONES:  He would have a resentencing.  This

7    would give him the ability to file another motion for

8    reconsideration of sentence.  Of course, we're asking for a

9    motion for reconsideration of sentence because it didn't

10   happen in the first place.  Either way the result would be the

11   same concerning a belated mod or a new mod based on a new

12   sentence.

13        THE COURT:  Well, if he were granted an

14   opportunity to file a belated motion for modification of

15   sentence, and you're right about Utter, couldn't that be

16   corrected at that time?

17        MS. JONES:  Yes, it could be.  It could all be

18   done at once in a resentencing.

19        THE COURT:  Okay.

20        MS. JONES:  And actually -- well, I'm not sure if

21   the post conviction judge can actually do the resentencing.

22        THE COURT:  Well, in this particular case the

23   sentencing judge happens to be a retired judge, although he

24   still sits here from time to time, so it would be easy to put

25   it back in front of him.  We could schedule it in front of

1   him.

2                    All right, go ahead.

3                    MS. JONES:  And that really basically is the

4   argument.  And I will supply a list of Mr. Quezenberry's pro

5   se arguments as we have discussed.

6                    THE COURT:  I don't think I had any testimony

7   about why -- I mean what was the ineffective assistance of

8   counsel with regard to the motion, was there one requested and

9   not filed?

10                   MS. JONES:  For reconsideration of sentence?

11                   THE COURT:  Yes.

12                   MS. JONES:  It's really under the Adams case,

13  there's no greater risk that the sentence would be imposed

14  that's pro se ineffective assistance.

15                   THE COURT:  But unless it was something that I

16  missed that he alleged he asked for it and it didn't happen.

17                   MS. JONES:  Honestly, given all this I had

18  forgotten to ask him.  May I just ask him now?

19                   THE COURT:  Any objection?

20                   MS. DYKES:  No, Your Honor.

21                   THE COURT:  All right, go ahead.

22  BY MS. JONES:

23       Q.    After sentencing, Mr. Quesenberry, did you discuss

24  post trial motions?

25       A.    I can't remember.

1          Q.     You can't remember, okay.  Would you have filed a

2   motion for reconsideration?

3          A.     I have in the past.

4          Q.     You have in the past, so you were aware.  So this

5   conversation didn't happen at that time?

6          A.     I thought we were supposed to have testimony.

7          Q.     From who?

8          A.     From Mr. Murray.  I thought you can't claim

9   ineffective counsel unless you get him up there and him

10   testify.

11             THE COURT:  We only have a question put to you

12   about -- and I think you've answered you can't remember.  Do

13   you have any questions for him?

14                       CROSS-EXAMINATION

15   BY MS. DYKES:

16          Q.     Were you aware that if you were resentenced or the

17   motion for reconsideration was granted you could get life

18   times two?

19          A.     I already got that.

20             THE COURT:  Okay, no other questions?

21             MS. DYKES:  No.

22             THE COURT:  Did you wish to call any witnesses in

23   light of his additional testimony?

24             MS. DYKES:  Yes, Your Honor, very briefly.

25             Mr. Murray.

1  _____

2  Whereupon,

3                    JAMES P. MURRAY,

4  a witness produced on call of the State, after having been

5  duly sworn, according to law, was examined and testified as

6  follows:

7                    DIRECT EXAMINATION

8  BY MS. DYKES:

9      Q.    Good afternoon, Mr. Murray.

10      A.    Good afternoon.

11      Q.    Welcome back.

12          After sentencing of this Defendant did you discuss

13  with him his post trial rights.

14      A.    I did.

15      Q.    And post sentencing rights.  Was part of that

16  discussion a motion for reconsideration of sentence?

17      A.    I have in my notes that I made post trial that we

18  did discuss the three judge panel option.  That I suggested to

19  him that that wouldn't be a good idea because he could

20  conceivably be sentenced to two life terms.  And I don't have

21  in my notes that we discussed reconsideration of sentence but

22  I'm sure we discussed all of that because that's my general

23  practice.

24      Q.    If this Defendant had asked you to file a motion

25  for reconsideration would you have filed it?

1          A.    Yes.

2          Q.    If this Defendant had asked you to file a three

3     judge panel review would you have filed it?

4          A.    Even though it wouldn't be my suggestion, yes, I

5     would have.

6                MS. DYKES:  Nothing further.

7                THE COURT:  Mr. Murray, before you get to

8     cross-exam, I don't think you were asked to state your name

9     and professional address for the record.

10                THE WITNESS:  James P. Murray, my professional

11    address is 30584 Beach Plumb Lane, Bethany Beach, Delaware,

12    temporarily.

13                MS. DYKES:  I apologize.

14                          CROSS-EXAMINATION

15    BY MS. JONES:

16         Q.    Mr. Murray, is it fair to say that you don't

17    remember a discussion about a motion for modification?

18         A.    That's correct.  I have no -- as I sit here today

19    I can't tell you that I have a recollection of the discussion.

20    What I can say is that I would have discussed, as the Judge

21    would have discussed, the post trial rights.

22         Q.    You were the District Public Defender here for

23    some time, isn't that correct?

24         A.    Yes.

25         Q.    Isn't it true that your office and the Public

1   Defenders here don't ordinarily file motions for

2   reconsideration of sentence?

3        A.    We will file them if we're asked to file them.

4   Now there have been attorneys, I think, and I can't point to

5   an example, where it's been requested and it doesn't get done

6   for whatever reason, but certainly if the request is made it's

7   something that we're required to do.

8        Q.    But was it general policy not to do them

9   automatically?

10       A.    Before I came to -- when I was not in charge there

11  did appear to be somewhat of a resistance to file post trial

12  motions for reconsideration when the attorney didn't think it

13  had any merit to it.  That does seem to -- that's my

14  impression.  But when I was in charge, you know, if a client

15  -- a client has these post trial rights, if we're asked

16  affirmatively to do it then we do it.

17       Q.    But you only did it affirmatively.

18       A.    Yeah, unless I -- there have been occasions --

19  yes, particularly in cases where, you know, I thought that it

20  wasn't going to go anywhere.  But I have done them proactively

21  on my own in situations that I thought were very unfair.

22       Q.    So you left it to the attorney to make that

23  decision?

24       A.    Absolutely.

25       Q.    Okay.  So you didn't follow along with Flansburg

1    or the Adams case?

2          A.    I don't know what those --

3          Q.    Well, it's pro se ineffective assistance if

4    there's no greater risk of a sentence being increased.

5          A.    All I can tell you is evidently I didn't file one

6    in this case but I can also tell you I wasn't requested to

7    file one.  And I'm confident that we did discuss post trial

8    rights, including reconsideration, because I would not have

9    had a conversation with my client about the three judge panel

10   in 30 days and not also have a conversation about

11   reconsideration of sentence.  And he did know that he had the

12   ability to file for a new trial, which he wrote me and

13   requested that I do that at some point way past the deadline.

14   And I didn't do that, I felt that that was baseless, no basis

15   in fact or in law to do that.

16         THE COURT:  Am I understanding your question

17   correctly?  Was your question trying to elicit whether the

18   practice of the local district office was to automatically

19   file one or to wait until it was requested?

20         MS. JONES:  Yes, that was my question.  Yes,

21   that's correct.

22         THE COURT:  Did you understand that to be the

23   question?

24         THE WITNESS:  Yes.  To my knowledge we don't have

25   a blanket policy either way, or we didn't at least at that

1    time.

2              MS. JONES:  That's all I have, Your Honor.

3              THE COURT:  Any redirect?

4              MS. DYKES:  No, Your Honor.

5              THE COURT:  Thank you, you may step down.

6              MS. DYKES:  Thank you, Mr. Murray.

7              THE COURT:  Now we've concluded again with our

8    testimony.

9              Do you wish to be heard as to closing argument?

10             MS. JONES:  Just as I stated concerning vacating

11   the burglary charge, it does merge under the Utter case.

12             And giving the right to file a belated motion for

13   reconsideration of sentence and/or if the sentence is vacated,

14   a new sentencing hearing which would then give Mr. Quesenberry

15   the right to file that.

16             THE COURT:  Do you believe that the -- well, the

17   only thing you're asking me to vacate is the --

18             MS. JONES:  Burglary charge, if he's resentenced.

19             THE COURT:  Because you claim it should have

20   merged.

21             MS. JONES:  Correct.  I'm requesting a new

22   sentencing hearing.  There will be a new sentencing event.

23             THE DEFENDANT:  I want all my good time.

24             MS. JONES:  Well, that's a different story.

25             It's the Greco case out of 1997, and there's

1    several other cases but when there's a new sentencing event

2    and someone is resentenced, they then have the right to file

3    another motion for reconsideration of sentence.

4            THE COURT:  What you're calling motion for

5    reconsideration I call a motion for modification.

6            MS. JONES:  It's the same thing, anything to

7    depart downward, what is it for, Rule 4-345 is it?

8            THE COURT:  Okay.  And just so I'm clear, he's not

9    seeking a belated motion to file a belated request for a three

10   judge panel.

11           MS. JONES:  Correct.

12           THE COURT:  Okay.  And these two cases you cited,

13   Adams was one.

14           MS. JONES:  Uh-huh.

15           THE COURT:  You believe those cases stand for the

16   proposition that defense counsel should automatically file?

17           MS. JONES:  Yes, I do.

18           THE COURT:  No matter what.

19           MS. JONES:  Yes, I do.

20           THE COURT:  Even if the person says don't do it.

21           MS. JONES:  Well, if a person affirmatively says

22   don't do it.

23           THE COURT:  Okay.  But if there's no don't do it,

24   do it.

25           MS. JONES:  Do it.  Yes, I do say that.  And I

1  would argue because we're all over the state, that's why I

2  asked a question about this particular county.

3            THE COURT:  Okay.

4            MS. JONES:  That our collateral review division

5  argument is that because a Defendant might be able to get a

6  downward reduction of sentence, if that motion for

7  modification is held perhaps sub curia for up to five years,

8  something may happen that might make the Court look kindly on

9  that Defendant.  Maybe they wouldn't at first but they could

10 ask to hold that motion sub curia.  They have five years to do

11 this.  If you have a policy where you don't file those

12 motions, it precludes any Defendant from having his sentence

13 modified downward at a future date.

14           THE COURT:  I don't think -- first I think he said

15 there wasn't a policy at the end.

16           MS. JONES:  Or if you have -- even if it's not a

17 policy, if an attorney doesn't do that.

18           THE COURT:  Automatically.

19           MS. JONES:  Automatically, it's really making it

20 impossible for -- if something good happens, and I always use

21 kind of a silly example of he saves the Warden's life in a

22 fire, there might be some good things that somebody might do

23 in that period of time when that modification is filed.  If

24 the attorney makes his own unilateral decision not to do that

25 because I don't think the judge is even going to listen,

1  that's precluding that Defendant from changing his behavior.

2          THE COURT:  Well, I don't think that's what he

3  said happened in this case.

4          MS. JONES:  No, I'm not suggesting, this is my

5  argument for why this should be done in all cases.

6          THE COURT:  Okay.  But the facts in this case are,

7  as I understand it, if I believe Mr. Murray, well, depending

8  on who I believe but let's assume I believe him --

9          MS. JONES:  Okay.

10         THE COURT:  -- he discussed the post trial rights

11 with your client, who did not -- was not interested in filing

12 a motion for modification.  But your reading of these two

13 cases is that even in that circumstance he should file it.

14         MS. JONES:  Well, I believe Mr. Murray's testimony

15 was more like I know we discussed the three judge panel but I

16 don't recall if we discussed --

17         THE COURT:  I thought he didn't recall the

18 specific conversation.

19         MS. JONES:  Right.

20         THE COURT:  But that he did say he discussed his

21 post trial rights.

22         MS. JONES:  He discussed post trial rights but

23 specifically that, he does remember specifically a three judge

24 panel and thought no, but he didn't recall specifically

25 whether he had discussed and had there been conversation about

1    that.  And my argument would be that Mr. Quesenberry should

2    have the right to at least have Judge Mitchell entertain that

3    possibility and it's not --

4              THE COURT:  Well, his testimony was it wasn't

5    discussed with him.

6              MS. JONES:  Correct.

7              And Mr. Murray's testimony was that I don't recall

8    if that specific motion was discussed, a motion for

9    modification was discussed.

10             THE COURT:  I heard his testimony differently.  I

11   thought his testimony was he couldn't recall the specific

12   conversation but he did discuss post trial rights, he does

13   with every client.

14             MS. JONES:  Yes, that's true.

15             THE COURT:  So that's different than saying I

16   recall this but I don't recall having that specific.

17             MS. JONES:  True, but he also did say I do

18   remember one piece of this, the three judge panel.

19             THE COURT:  Right, I understand.

20             MS. JONES:  Again, it's argument as to what was

21   meant and what was discussed.  And what our argument in cases

22   like this is that because there is only a possibility of a

23   sentence being modified downward, and because it's possible

24   that circumstances may change if that motion is held sub

25   curia, that it's unfair to the client not to file that motion,

```
1   and that the Adams case supports that.

2              THE COURT:  Okay.

3              MS. JONES:  Basically.  Is that clear?

4              THE COURT:  Yes, I understand.  I just wanted to

5   understand what your view of the Adams case is.

6              MS. JONES:  That's our view and this happens

7   constantly.

8              THE COURT:  All right.

9              MS. JONES:  And I will get to you a list.

10             THE COURT:  Okay.  I'll give you 30 days but you

11  need to make sure you give it to Ms. Dykes.

12             MS. JONES:  Oh, of course.

13             THE COURT:  So it's an agreed list.

14             Okay, Ms. Dykes.

15             MS. DYKES:  Thank you, Your Honor.

16             As to all other claims, there seem to be no legal

17  basis, they were waived or finally litigated in the appellate

18  court.  But I will address the merger or the sentencing as to

19  the first degree burglary and the attempted first degree rape,

20  the sentence is under count one and count five.  I will

21  indicate to Your Honor that there were two breakings at the

22  home on the night in question.  That the Defendant, as I

23  recall the facts, the Defendant broke in, raped or attempted

24  to rape Michelle.  He broke in again and the assault was less

25  invasive, I'll put it in those terms.  So I think -- I think
```

1   that that might have accounted for the sentencing, the

2   structure the way that Judge Mitchell did it.  But I was able

3   to review the sentencing, excuse me, the trial transcript that

4   I did not have a copy of but Ms. Jones had a copy today, and

5   it's apparent from Judge Mitchell's ruling at that time that

6   -- it's apparent to the State that as to count five, the

7   attempted first degree rape, he relied on not the burglary for

8   the conviction for attempted first degree rape, but the force

9   or threat of force whereby the Defendant's -- the victim's

10  testimony was the Defendant told her that he would kill her

11  and/or kill her father and that she knew him to carry a knife.

12  So it was that force or threat of force that is, I believe,

13  was Judge Mitchell's basis for the guilty finding under count

14  five and not the burglary.

15          So that's the State's belief as to, you know, why

16  that sentencing is appropriate.

17          THE COURT:  So it would not merge under those

18  facts.

19          MS. DYKES:  Yes, Your Honor.  And I'm sorry, I

20  didn't pull the page numbers from the transcript, but Ms.

21  Jones, do you mind?

22          MS. JONES:  No, no, not at all.

23          Are you talking about sentencing?

24          MS. DYKES:  No, the trial transcripts.

25          I apologize, Your Honor, I should have made note.

```
1                    It is trial transcript at 225 to 226.

2              THE COURT:  Okay.

3              MS. DYKES:  Is the Court's verdict and his

4    explanation thereof.  And he says we further find that her

5    will was overborne by the threats to her and to her father

6    made by the Defendant.  It is the finding of this Court that

7    such threat presented to a young person of this mental

8    capacity were accepted as literal statements and those

9    overcame any ability to violently object to the advances of

10   the Defendant.  So it is that reason, that's the State's

11   strongest argument that those sentences should not merge.

12             THE COURT:  Okay.

13             MS. JONES:  Your Honor, what I would contend is

14   that --

15             THE COURT:  Are you done with your argument?

16             MS. JONES:  Oh, I'm sorry.

17             MS. DYKES:  Yes, Your Honor.

18             THE COURT:  How about the motion as to reconsider

19   issue?

20             MS. DYKES:  Your Honor, it was discussed -- based

21   on Mr. Murray's testimony it was discussed with the Defendant,

22   the Defendant didn't request it.  I mean certainly the risk

23   was that, I believe anyway, that the Defendant's sentence

24   could be increased.  I'm not sure on the law, but Mr. Murray

25   clearly said that the Defendant didn't request it.  The
```

1  Defendant had been made aware of his right by the trial court

2  and then again by Mr. Murray.

3          THE COURT:  All right.  Now go ahead, you can

4  respond.

5          MS. JONES:  Just briefly.  At sentencing it

6  appears as if the way this was sentenced was that the burglary

7  was -- because he goes count 1, first degree burglary, ten

8  years; then he goes, this is page 23 of the sentencing, with

9  regard to the conviction under five, attempted first degree

10  rape, the term will be consecutive to the sentence I've just

11  imposed under number one.  And number one is first degree

12  burglary.  So that's one point, so it was predicated on the

13  burglary.

14          THE COURT:  How does that prove it's predicated on

15  the burglary?

16          MS. JONES:  Well, the way it was sentenced, I

17  think it -- that the two were put together and that --

18          THE COURT:  Whenever there's a second count and

19  you want it to be consecutive don't you have to say that?

20          MS. JONES:  Yeah, he says count one -- that's why

21  the sentence is a bit strange the way it was done, because it

22  seems out of order in general.  Because what he did is since

23  burglary was the first -- burglary was the first count.

24          THE COURT:  He went down them in order, is that

25  what he did?

1      MS. JONES:  Yes, he did go down them in order.

2      THE COURT:  I mean I just don't know that I can

3  infer from the order that he imposed the sentences under the

4  counts.

5      MS. JONES:  I think it's fair to say.  Well, the

6  second, because he starts with the burglary and then goes on

7  to the rape and says one is consecutive to the other.  I

8  understand what you're saying but I would say the burglary and

9  the rape, the attempted rape rather, were going together and

10  that's where the Utter case would fit in, that one was based

11  on that.

12      The other point that I would make though is that

13  while indeed there were technically two breakings because

14  Mr. Quesenberry went into the room, went out of the room, went

15  back upstairs into the room and the window was ajar, there was

16  something broken with the window catch, it was really one

17  continuous event.  It wasn't like there were two separate

18  things, like, you know, he left, it was sort of all during the

19  course of an hour or two on one evening or into the next

20  morning.  So it was really one continuous event, so there was

21  really one burglary situation.  And that's why I also think

22  that they should merge.

23      THE COURT:  Okay.  All right, thank you,

24  everybody.

25      MS. JONES:  Thank you.

1          THE COURT:  I'm going to hold the matter sub curia

2     and I'll issue a written opinion and order.

3          You're going to get that to me within 30 days.

4          MS. JONES:  I will do that.

5          THE COURT:  And Ms. Dykes will cooperate with that

6     I'm sure.

7          MS. DYKES:  I certainly will, Your Honor.

8          THE COURT:  Thank you all for your patience, it

9     was a varied and heavy docket.

10         Thank you so much.

11              (Conclusion of hearing.)

12                   - 0 -

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT REPORTER'S CERTIFICATE

2          I, Debra A. Dickerson, RPR, Official Court

3    Reporter for Wicomico County, Maryland, certify that I

4    recorded verbatim by stenotype the proceedings in the

5    above-entitled cause before the Honorable Leah J. Seatson,

6    Judge of said Court, Wicomico County, Maryland, on the 31st

7    day of January, 2013.

8          I further certify that to the best of my knowledge

9    and belief, the foregoing transcript constitutes a true and

10   correct transcript of the proceedings.

11         Given under my hand this 2nd day of December,

12   2015, at Salisbury, Maryland.


15                    _Debra A. Dickerson_

16                    Debra A. Dickerson, RPR